**LAWRENCE CARTY, et al., Plaintiffs**
**v.**
**ALEXANDER A. FARRELLY, et al., Defendants**

Civ. No. 94-78

District Court of the Virgin Islands

Div. of St. Thomas and St. John

January 29, 1997

401

BENJAMIN CURRENCE, ESQ., MARJORIE RIFKIN, ESQ., *for Plaintiffs*

ALVA A. SWAN, ESQ., (Deputy Attorney General), *for Defendant Government of Virgin Islands*

MAUREEN PHELAN CORMIER, ESQ., (Assistant Attorney General), *for Defendant Virgin Islands Bureau of Corrections*

JOHN SCHUMANN, ESQ., (U.S. Department of Justice), *for Intervenor, United States*

BROTMAN, *Judge*

## OPINION

### TABLE OF CONTENTS

**I. PROCEDURAL AND FACTUAL BACKGROUND** ......... 405
**II. THE PLRA AND ITS REQUIREMENTS**
 **CONCERNING CONSENT DECREES** ....................... 408
**III. FINDINGS REGARDING CONDITIONS OF**
 **CONFINEMENT AT THE CJC** ............................... 409
 A. Population ..................................................... 410
 B. Shelter, Physical Plant, and Environmental Health ........ 411
 C. Fire Safety .................................................... 413
 D. Medical Care .................................................. 413
 E. Mental Health ................................................. 416
 F. Corrections and Security ...................................... 418
 G. Compliance with Americans with Disabilities Act ........ 420
 H. Religious Freedom ............................................ 421
 I. Legal Access ................................................... 421

 J. Mail, Telephone, and Visitation .............................. 422
 K. Miscellaneous Provisions Regarding Expansion of
 the CJC ................................................ 422
IV. THE AGREEMENT: APPROPRIATE RELIEF FOR UN-
 CONSTITUTIONAL CONDITIONS OF CONFINEMENT
 AT THE CJC ..................................... 423
V. DEFENDANTS ARE IN CONTEMPT OF THE
 COURT'S ORDERS ............................... 424
 A. Orders to Enforce the Agreement ........................... 424
 B. Order to Pay Attorneys' Fees ................................ 428
VI. MODIFICATION OF THE AGREEMENT ................. 429
VII. REMEDIES ...................................... 432
VIII. CONCLUSION ................................... 433

BROTMAN, *Judge, Sitting by Designation*

Before this court are two related motions pertaining to the Settlement Agreement entered into by the parties on October 12, 1994 to remedy unconstitutional conditions at the Criminal Justice Complex (CJC) in St. Thomas, United States Virgin Islands. Plaintiffs' motion is twofold and seeks (1) an order holding defendants in civil contempt of the Settlement Agreement and imposing sanctions for defendants' continued failure both to abide by the terms of the Agreement and, ultimately, to remedy the unconstitutional conditions at the CJC; and (2) an order granting further relief to compel the defendants to pay court-ordered attorneys' fees in the amount of $105,000. Defendants, in turn, have moved to modify the Settlement Agreement pursuant to Fed. R. Civ. P. 60(b), based on alleged unforeseeable changed circumstances that prevent their compliance with the Agreement.[1]

---

[1] Defendants filed their motion and supporting papers as a Motion to Terminate the Consent Agreement. At the onset of an evidentiary hearing held on November 7 and 8, 1996, the defendants asserted that they do not seek to terminate the Agreement; rather, they request a modification of the Agreement. In view of this change, the Court ordered that defendants submit a Motion to Modify the Consent Decree. The present opinion and order therefore treat the defendants' request as one to modify, not terminate, the Agreement. To that end, the court need not reach the legal issues raised by the Motion to Terminate.

## I. Procedural and Factual Background

This action commenced in June 1994, when plaintiffs—a group of pretrial detainees and sentenced inmates confined in the CJC— filed a class action Complaint and Motion for Preliminary Injunction challenging alleged unconstitutional, inhumane, and dangerous conditions of confinement at the CJC.[2] Plaintiffs requested that the court close the CJC because of the extreme overcrowding that has spawned many of the alleged constitutional violations. On October 12, 1994, the parties entered into a Settlement Agreement (hereinafter "Agreement").[3] This Agreement obligates the defendants to remedy conditions at the CJC, and establishes specific requirements and deadlines to effect this remedy for the safety and security of prisoners and staff at that facility. In particular, the Agreement provides guidelines governing the following: 1) Population,[4] 2) Shelter, Physical Plant, and Environmental Health, 3) Fire Safety, 4) Medical Care, 5) Mental Health, 6) Corrections and Security, 7) Compliance with Americans with Disabilities Act, 8) Religious Freedom, 9) Legal Access, 10) Mail, Telephone, and Visitation, and 11) Miscellaneous Provisions regarding expansion of the CJC. Subsequent to the Agreement, the court granted plaintiffs' Motion for Attorneys' Fees and ordered defendants to compensate the National Prison Project of the American Civil Liberties Union Foundation in the amount of $155,000. To date, defendants have paid $50,000 of that award.

To monitor compliance with the Agreement, the court appointed a Special Master and reviewed the findings and recommendations

---

[2] Plaintiffs named as defendants the Governor of the Virgin Islands, the Director of the Virgin Islands Bureau of Corrections, the Warden and Acting Assistant Warden of the CJC, St. Thomas, U.S.V.I., the Attorney General of the Virgin Islands, and the Virgin Islands Bureau of Corrections. All defendants were sued in their official capacity.

[3] During the course of this litigation, the parties and the court have also referred to this Agreement as a Consent Decree. The court's analysis proceeds with the understanding that the "Settlement Agreement" and the "Consent Decree" dated October 12, 1994 are the same document, reached by consent of all parties and representing their agreement to settle the dispute. This Agreement was entered as a final order by the court on December 7, 1994.

[4] The Agreement provides that defendants would reduce the CJC population to 97 inmates by April 1, 1995. It also provides that defendants would move some prisoners to the Halfway House facility, or "Annex".

of the Special Master on a regular basis.[5] Both plaintiffs and defendants have had opportunity to lodge objections to all Special Master reports.

In light of defendants' continued non-compliance with both the Agreement and the court's orders in this matter, plaintiffs filed a motion to show cause why the defendants should not be held in civil contempt. At the same time, plaintiffs requested an order for further relief with respect to unpaid attorneys' fees. As noted previously, an evidentiary hearing took place on November 7 and 8, 1996 to address these issues. During these proceedings, the court heard testimony about and placed into evidence various documents and photographs illustrating the conditions at the CJC. In addition, because the defendants' motion was cast initially as one to terminate the Consent Decree in light of the Prison Litigation Reform Act of 1995 ("PLRA"), Pub. L. No. 104-134, §§ 801 et seq., 110 Stat. 1321 (Apr. 26, 1996), the court heard argument regarding the constitutionality of the PLRA.[6]

■ Based on the testimony taken and the evidence submitted at the hearing, the court finds that the conditions at the CJC presently do not meet minimal, constitutional standards. Further, the court finds that subjecting CJC prisoners—both pretrial detainees and sentenced inmates—to the currently unremedied conditions at the CJC violates their rights under the Eighth and Fourteenth Amendments to the Constitution.[7]

---

[5] Magistrate Judge Jeffrey Resnick served as the Special Master from December 1994 to April 1996. Since then, Darlene C. Grant, Esq. has served as the Special Master in this matter, and has filed three reports detailing her findings and recommendations regarding the CJC. During his tenure as Special Master, Judge Resnick also filed a special master report which this court adopted on October 17, 1995.

[6] On October 1, 1996, the court granted the motion of the United States to intervene pursuant to 28 U.S.C. § 2403(a) on the issue of the constitutionality of the PLRA. As a result, the attorney from the Department of Justice participated in the evidentiary hearing and stated to the court the position of the United States with respect to the PLRA; that is, to the extent applicable to the present matter (and *only if the court reaches* the constitutional question, *see infra* sec. II), the United States defends the constitutionality of the PLRA. Defendants adopted the position of the United States in urging the court to uphold the automatic termination provisions of the PLRA. (Tr. at 43, 48.) Plaintiffs, in contrast, claimed that these provisions are unconstitutional. *See infra* sec. II for further discussion of disputed PLRA provisions and requirements.

[7] The court recognizes that the allegations of the pre-trial detainees must fall under a different analytic rubric than those of the sentenced inmates. *See Union County Jail*

The court also recognizes its obligation to evaluate plaintiffs' claims under "'objective indicia' of contemporary standards of decency". *Union County Jail Inmates*, 713 F.2d at 999 n.22 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346-47, 69 L. Ed. 2d 59, 101 S. Ct. 2392 (1981)). The Constitution contemplates, however, that a court's judgment will bear on the constitutionality of a given punishment. *See Peterkin v. Jeffes*, 855 F.2d 1021, 1024 (3d Cir. 1988) (quotations omitted). Nevertheless, the court notes that its findings do not represent "merely the subjective view" of either the Special Masters or this court, see *id.*; rather, the conclusions are based on (1) objective evaluations of recognized experts in particular fields related to the issues at bar; see Court Exh. 3, Apps. D, F-J; (2) case law accounts of similar disputes—representing a history of prison litigation such as the present; and (3) evidence, both testimonial and documentary, presented by the parties in formal court proceedings in this matter.

■ In light of the court's findings and cognizant of the Agreement whereby the defendants bound themselves to establishing constitutional conditions of confinement at the CJC, the court finds that the defendants are in civil contempt of both the Agreement and court orders to enforce its terms. To that end, the court has also examined the Agreement and concludes that its terms are narrowly tailored to address the constitutional violations suffered by the plaintiffs. Further, the court finds that the Agreement extends no further than necessary to correct the clear violations of plaintiffs' federal rights under the Constitution. As such, the Agreement comports with the requirements of section 802(b)(3) of the PLRA and continues to bind all parties to its terms.

---

*Inmates v. DiBuono*, 713 F.2d 984, 992 (3d Cir. 1983) (quoting *Bell v. Wolfish*, 441 U.S. 520, 535, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (1979) (due process standard governing pre-trial detainees requires query whether totality of conditions causes excessive privations and hardship)). Because of its finding that the conditions violate the Eighth Amendment, however, the court can conclude simultaneously that the due process standard applicable to pre-trial detainees has been violated as well. *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979).

## II. The PLRA and Its Requirements Concerning Consent Decrees

■ A court may not terminate prospective relief if it determines that "prospective relief remains necessary to correct a current orongoing violation of a Federal right." 18 U.S.C.A. § 3626(b)(3) (West 1997). *See also Plyler v. Moore,* 100 F.3d 365, 369 (4th Cir. 1996). More precisely, if a court makes written findings as to the current conditions in a prison subject to a consent decree and declares that the relief provided by the decree is narrowly drawn, extends no further than necessary to correct the violation of that Federal right, and is the least intrusive means necessary to correct the violation, then the PLRA does not require the court to terminate the prospective relief, even if the decree had been previously granted or approved in the absence of such written findings. *Hadix v. Johnson,* 933 F. Supp. 1362, 1364 (W.D. Mich. 1996).

Recognizing the current posture of the matter at hand—that is, since the defendants no longer seek to terminate the Agreement, but rather ask the court to modify its terms—this court will not address the argument regarding the alleged unconstitutionality of the PLRA or any of its relevant provisions.[8] Because the PLRA allows the court to make specific findings even after a consent decree has been granted and approved, because these findings will enable the court to uphold the Agreement, and, indeed, because both plaintiffs and defendants in this matter desire ultimately to attain the goals set forth in the Agreement, the court can "avoid the constitutional question" and need not decide whether the PLRA's provision authorizing a court to terminate a consent decree is unconstitutional. *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 99 L. Ed. 2d 645, 108 S. Ct. 1392 (1988) (stating courts need not confront constitutional issues if not necessary to resolve issue); *Hooper v. California,* 155 U.S. 648, 39 L. Ed. 297, 15 S. Ct. 207 (1895) (stating "elementary

---

[8] The position of the United States is consistent with this resolution in that the United States defends the constitutionality of the PLRA's automatic termination provisions insofar as the proceedings require the court to resolve this issue. (Tr. at 17-18; *see also supra* n.6.) As noted herein, the posture of the present dispute does not now demand scrutiny of these provisions.

rule" that court must construe statutes reasonably to uphold their constitutionality).

## III. Findings Regarding Conditions of Confinement at the CJC

██ ██ The Eighth Amendment prohibits the infliction of cruel and unusual punishment on those convicted of crimes.[9] *Wilson v. Seiter*, 501 U.S. 294, 296-97, 115 L. Ed. 2d 271, 111 S. Ct. 2321 (1991). This standard applies when prison inmates suffer deprivation during imprisonment. *Estelle v. Gamble*, 429 U.S. 97, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976). While the Constitution "does not mandate comfortable prisons," *Rhodes*, 452 U.S. at 349, it does require that prisons provide "the minimal civilized measure of life's necessities." *Id.* at 347. To that end, denial of medical care, dehumanizing conditions, exposure to pervasive risk of assault, severe overcrowding, and unsanitary conditions all violate contemporary standards of decency. *Tillery v. Owens*, 907 F.2d 418, 426 (3d Cir. 1990). And while "prison conditions" as a catch-all category do not create "a seamless web for Eighth Amendment purposes," where the individual conditions "have a mutually enforcing effect that produces the deprivation of . . . identifiable human need[s]" the conditions violate the Eighth Amendment. *See Wilson*, 501 U.S. at 304.

██ In determining whether the conditions at the CJC fall below the minimum constitutional standards, the court must evaluate a broad range of factors to view the totality of the circumstances. *Tillery*, 907 F.2d at 426; *Peterkin*, 855 F.2d at 1025-26. Under this approach, the court can determine that "the totality of conditions . . . deprive[s] inmates of the minimal civilized measures of life's necessities." *Id.* at 1024 (quotation omitted). To so hold, the court examines objective factors—food, shelter, medical care, sanitation, safety, the physical plant, education or rehabilitational programs, length of confinement, out-of-cell time—weighs all the evidence, and concludes, "instance by instance, whether the condition in

---

[9] The Eighth Amendment applies to the states (and, in this matter, to the U.S. territory of the Virgin Islands) through the Due Process clause of the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660, 666, 8 L. Ed. 2d 758, 82 S. Ct. 1417 (1962).

question withstands Eighth Amendment scrutiny." *Id.* at 1025, 1027.

The plaintiffs' grouping of the extensive list of constitutional violations as well as the structure of the Agreement designed to remedy each category of problems provide an appropriate framework for the court's analysis. The in seriatim discussions of the individual areas of concern, then, together serve as the broad basis for the court's ultimate finding that the conditions of confinement at the CJC do indeed fail to meet constitutional requirements.

## A. Population

■ Overcrowding of inmates in correctional facilities can lead to violence among prisoners, breakdowns in classification systems, deterioration of the physical condition of the prison, and other safety hazards. When overcrowding causes such adverse effects, the overcrowding is unconstitutional. *Tillery*, 907 F.2d at 427; *Vazquez v. Carver*, 729 F. Supp. 1063, 1069-70 (E.D. Pa. 1989). Similarly, overcrowding which requires prisoners to sleep on mattresses on the floor on a consistent basis violates the Eighth and Fourteenth Amendments to the Constitution. *Newkirk v. Sheers*, 834 F. Supp. 772 (E.D. Pa. 1993).

The population of the CJC far exceeds the facility's maximum population capacity.[10] The individual, 72-square-foot prison cells consistently house four times as many inmates as they were designed to accommodate.[11] Often, five or six persons have been housed in a single cell. (Court Exh. 3, at Table 4.) Where a cell houses more than two individuals, those who do not sleep in a bed sleep on mattresses on the floor, often with their heads against a toilet. (Tr. at 63, 76.) As a result, it is not uncommon for one inmate to urinate on another during the night, causing both increased tension and violence among the prisoners as well as unsanitary conditions in the cells. (Tr. at 76-77.)

---

[10] The defendants house an average of 168 to 190 prisoners in a jail designed to hold 51 short-term detainees. (Tr. at 63.) The Agreement requires defendants to reduce the population to 97 inmates.

[11] While the cells were originally designed for one inmate, the CJC refers to them as two-man cells, double-ceiling inmates and providing appropriate sleeping facilities for two persons.

Considering the applicable legal principles, *see* U.S. Const. amend. VIII; *Tillery*, 907 F.2d at 427; *Newkirk*, 834 F. Supp. at 772; *Vazquez*, 729 F. Supp. at 1069-70, the court must conclude that prisoners at the CJC are housed under unconstitutional conditions.

## B. Shelter, Physical Plant, and Environmental Health

■ In keeping with the totality of circumstances analysis, this court next considers all factors that bear on the nature of the shelter provided for the CJC inmates. *Union County Jail Inmates*, 713 F.2d at 999. Generally, sanitation is one of the most basic human needs. *Peterkin*, 855 F.2d at 1027. In particular, the state of disrepair of the facilities (including plumbing, heating, ventilation, and showers) and the effect that substandard conditions have on the inmates' sanitation and health informs whether the prison provides an inhabitable shelter for Eighth Amendment purposes. *Id.* at 1000-01 & n.30. Inadequate ventilation, for instance, increases the risk of disease transmission and contributes to a finding of unconstitutional conditions. *Tillery*, 907 F.2d at 423; *Hassine v. Jeffes*, 846 F.2d 169, 174 (3d Cir. 1988). Conditions that generate infestation of vermin also do not comport with minimal civilized measures concerning a person's basic welfare. *Kost v. Kozakiewicz*, 1 F.3d 176, 188 (3d Cir. 1993). Inoperable plumbing systems contribute to both the risk of conveying waterborne disease and vermin infestation, and thus implicate constitutional violations. *Tillery*, 907 F.2d at 423-24.

■ Correctional officers may be held liable for failing to correct unconstitutional conditions of confinement. *Oliver v. Thornburgh*, 587 F. Supp. 380, 382 (E.D. Pa. 1984). Where prison officials are aware of unsanitary conditions and inadequate ventilation, but nonetheless do not remedy these wrongs, the officials disregard excessive risk to inmates' health and safety and exhibit punishable deliberate indifference. *See Farmer v. Brennan*, 511 U.S. 825, 837, 128 L. Ed. 2d 811, 114 S. Ct. 1970 (1994).

The conditions of the CJC physical plant and its effect on the environmental health of the prisoners evince serious, constitutional violations. *Cf. Rhodes*, 452 U.S. at 352 (sordid, deplorable prison conditions subject to scrutiny under Eighth Amendment). The CJC lacks a preventive plant maintenance system—its roof

411

leaks;[12] light fixtures and hot water heaters for inmate showers are non-functional;[13] mattresses are soiled, damaged, and not exchanged regularly; drinking water is not chlorinated consistently and the cistern is not clean. (Court Exh. 3, at 23-25, App. H.)

The ventilation system at the CJC also does not function properly and contributes to the breeding and spreading of disease. (Court Exh. 3, at Apps. I, J; Court Exh. 9.) Air in the prison cells is fetid and odorous, smelling of sweat and unwashed human bodies. (Tr. at 84.) The cells are dark and windows sealed to exclude all natural light. (Tr. at 77.) Shower areas leak, due to cracked, broken, and missing tiles. This, in turn, causes the inmates' cells to flood, soaking mattresses and personal belongings. (Tr. at 88, 149.) The mattresses themselves are torn and unsanitary, a result of routine failure to sanitize and replace them. (Court Exh. 9, at 3; Tr. at 289.)

The CJC also does not have comprehensive institutional housekeeping, kitchen maintenance, and sanitation plans, or adequate vermin control programs. (Court Exh. 3, at 23-25, Apps. H, I; Court Exh. 9, at 2; Tr. at 87.) These deficiencies pose an "immediate threat to the health and safety of both [CJC] staff and inmate[s]." (*Id.*; Tr. at 162.) Rodents and cockroaches infest the entire facility, including the housing, kitchen, and medical areas, and expose the inmates to disease and other harm. Several inmates have been bitten by rats. (Tr. at 84, 107, 146-47.) Prisoners maintain collections of roaches in their cells, and have stored them in containers filled up to three inches deep with live roaches gathered in just one night. (Pl. Exh. 1, at 15A; Tr. at 85.)

Defendants acknowledge the facility's structural and environmental shortcomings and have failed to remedy them. (Court Exh. 3, App. C; Tr. at 192, 267, 305.) Predicated on the deliberate indifference standard and the principles governing the physical and environmental conditions of prisons, the court finds that these conditions fail to meet constitutional standards.

---

[12] As a result, water leaks into the kitchen and housing areas. (Court Exh. 3, at 5, App. J; Tr. at 149-50.)

[13] The lack of hot water affects not only the inmates' inability to maintain minimal personal hygiene but also their inability to clean their plastic eating utensils. (Tr. at 84.)

## C. Fire Safety

 Failure to provide functional fire safety systems subjects prisoners to life-threatening conditions. *Tillery*, 907 F.2d at 424; *Inmates of Allegheny County Jail v. Wecht*, 874 F.2d 147, 154 (3d Cir.), *judgment vacated on other grounds*, 493 U.S. 948, 110 S. Ct. 355, 110 S. Ct. 355 (1989) (remanding to Third Circuit which, in turn, vacated as moot original order closing jail because of stipulation to remedy conditions). At the CJC, cell locking devices, manual alarm systems, smoke dampers, and heat detectors are inoperable, all of which together poses a security risk during a fire emergency. (Court Exh. 3, at 23-25, 37, App. H.) Indeed, the building itself cannot adequately protect the occupants during a fire. Pl. Exh. 7, at 11-15; Court Exh. 3, App. C; Tr. at 229.)[14] As such, the fire safety provisions do not withstand scrutiny under Eighth Amendment principles.

## D. Medical Care

States must provide treatment for prisoners' serious medical needs. *Wilson*, 501 U.S. at 303; *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 200, 103 L. Ed. 2d 249, 109 S. Ct. 998 (1989); *Estelle*, 429 U.S. at 103-04. These needs must not necessarily be life-threatening; pain medication for an injured wrist, for example, constitutes a "serious medical need," *Yosuf v. United States*, 642 F. Supp. 415 (M.D. Pa. 1986), as does a need to treat an ulcer, *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990), or the need for medication to control blood pressure. *Id.*[15]

 Knowing failure of a correctional system to provide a minimum level of necessary medical service subjects prisoners to cruel and unusual punishment. *See Harris v. Thigpen*, 941 F.2d 1495, 1509 (11th Cir. 1991); *Inmates of Allegheny County Jail v. Wecht*, 699 F. Supp. at 1146. That is, the law punishes deliberate indifference of prison officials who know of and disregard excessive risks to

---

[14] The prison occupies only the third floor and roof of the CJC building; floors one and two are unoccupied except for one portion used by the police as a 911 station. The fire alarm system, however, operates only on the third floor and roof area. (Tr. at 227, 229.)

[15] The district court has the discretion to determine the factual question of whether a medical need is "serious." *West v. Keve*, 571 F.2d 158, 162 n.6 (3d Cir. 1978).

inmates' health and safety. *Farmer*, 511 U.S. at 837. Thus, while society does not expect that prisoners will have unqualified access to health care, a prison official who does not attend to serious medical needs of an inmate violates that inmate's constitutional right. *See Hudson v. McMillian*, 503 U.S. 1, 9, 117 L. Ed. 2d 156, 112 S. Ct. 995 (1992) (citing Estelle, 429 U.S. at 103-04).

Providing *inadequate* medical staff effectively denies inmates access to diagnosis and treatment and constitutes deliberate indifference. *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d at 762. Similarly, lack of screening or inadequate screening of incoming prisoners exposes prisoners to unreasonable health risks; deliberate indifference to such risks constitutes punishable behavior. *Helling v. McKinney*, 509 U.S. 25, 35, 125 L. Ed. 2d 22, 113 S. Ct. 2475 (1993); *Monmouth County Corr. Inst. Inmates v. Lanzaro*, 595 F. Supp. 1417, 1442 (D.N.J. 1984), *modified*, 695 F. Supp. 759 (D.N.J. 1988), amended in part and clarified in part, 717 F. Supp. 268 (D.N.J. 1989). Further, failure to refer prisoners requiring medical care from an outside specialist to such providers also constitutes deliberate indifference. *Inmates of Allegheny County v. Pierce*, 612 F.2d at 762. Finally, exercise is a basic human need protected by the Eighth Amendment. *Wilson*, 501 U.S. at 304-05. In a facility that locks down its prisoners for long time periods, the law thus requires officials to permit at least minimal out-of-cell recreation or exercise.

Medical care provided at the CJC is inadequate. The health care coordinator and mental health worker responsible for the CJC attend to inmates' needs infrequently. (Court Exh. 3, at 41.) One on-site nurse and one on-site medical doctor and two part-time nurses service the 168 to 190 prisoners housed at the CJC. (*Id.*)[16] Sick call is administered by prison security staff instead of medical staff, and prison records do not indicate that inmates are seen promptly as needed. (Tr. at 91.) Inmates injured on a weekend sometimes do not receive medical attention until the following weekday. (Tr. at 90.) Similarly, the defendants either do not transport to outside treatment facilities—such as the infirmary at

---

[16] The two part-time nurses work only on weekends and, even then, only report to duty sporadically. (Court Exh. 3, at 41; Tr. at 90, 152.)

414

Golden Grove or the hospital facilities in St. Thomas—those prisoners who require specialized medical attention, or give preferential treatment only to those inmates who require emergency care.[17] (Court Exh. 3, at 58; Court Exh. 4; Court Exh. 9, at 3-4; Pl. Exh. 4, at 7.)

In addition, the facility does not maintain adequate equipment for medical emergencies despite notice of the need for specific items such as a crash cart, oxygen, and airways. (Court Exh. 3, at 44; Tr. at 90, 152, 213.) Such equipment is critically important considering the high frequency of violent incidents requiring significant medical attention: several inmates have been beaten into comas and many have sustained serious injuries in violent assaults. *See infra* secs. III.E.-F. CJC staff also do not distribute regularly the necessary personal hygiene items such as toothpaste and sanitary napkins; rather, they issue them selectively in order to discipline inmates. (Court Exh. 2; Court Exh. 3, at 53; Court Exh. 9, at 2; Tr. at 151-52.)

Inadequate intake health evaluations also contribute to the substandard medical care provided to the prisoners. Newly admitted inmates are not screened consistently to identify serious diseases such as tuberculosis, mental illness, substance abuse, or suicide risk. (Court Exh. 3, at 50-51, 53; Court Exh. 9, at 4; Tr. at 92-93.) PPD tests, while administered, are not read regularly within the requisite timeframe. (Tr. at 94-95.) Worse, newly admitted, non-screened inmates are incarcerated together with the general population in open-barred "lock-down" cells, exposing inmates, staff, and others to unidentified disease. (Court Exh. 3, at 53; Court Exh. 4, at 24-27; Court Exh. 5, at 14; Court Exh. 9, at 3; Tr. at 93-94.)[18] Further, inmates who demonstrate unusual behavior indicative of mental illness are not hospitalized for diagnosis; rather, they are sometimes separated into separate cell clusters or locked down into solitary confinement. (Court Exh. 3, at 53.) Inmates who suffer from identifiable medical conditions such as

---

[17] Moreover, CJC transportation staff, not medical staff who would otherwise evaluate a particular prisoner's medical needs, exercises the discretion to carry out requests for hospital appointments. (Court Exh. 3, at 58.)

[18] Defendants attribute this policy to the population problem at CJC. The Warden testified that "the jail is full, full, we cannot do it, just don't have any room." (Tr. at 295.)

high blood pressure, hypoglycemia, and diabetes do not receive special diets necessary in light of their illnesses. (Court Exh. 9, at 5; Tr. at 109.)[19]

Finally, the defendants fail to offer access to the outdoors to all inmates. A portion of the prison population, then, consistently remains confined in an overcrowded environment with inadequate ventilation for long time periods, sometimes up to two weeks. *See supra* section III.B; Tr. at 118. While male inmates may partake in outdoor recreation on the roof of the CJC for 60 to 90 minutes, five days per week, females receive access to outdoor recreation infrequently and only at the whim of individual officers. (Tr. at 117-18.)

Defendants acknowledge that they provide inadequate medical care and agree with the findings of the experts to that effect. (Court Exh. 9; Tr. at 216.) Defendants' conduct with regard to plaintiffs' medical needs thus clearly violates constitutional standards and subjects the prisoners to cruel and unusual punishment.

### E. Mental Health

Failure to house mentally ill inmates apart from the general prison population also violates the constitutional rights of both groups. *See Tillery v. Owens,* 719 F. Supp. 1256, 1303-04 (1989), *aff'd,* 907 F.2d 418 (1990). Commingling the two populations increases the level of tension among all prisoners and endangers the well-being of the mentally ill who suffer from retaliation. *Id.* Moreover, prisoners with psychiatric conditions are entitled to treatment by qualified, professional mental health staff. *Id.* at 1302-03. Indeed, lack of a mental health facility can support a court's decision to close the jail. *Inmates of Allegheny County Jail v. Wecht,* 874 F.2d at 153.

Mental health services at CJC do not exist. The facility does not have on-site mental health staff to identify systematically and regularly those prisoners with mental illnesses. (Court Exh. 3, at 62, App. C, App. I at 2; Tr. at 214-15, 284.) As a result, prison staff, otherwise unqualified to assess properly mental illness, identify inmates who require mental health services. (Court Exh. 3, at 62; Tr.

---

[19] Inmates also do not always receive clean eating utensils for each meal. (Tr. at 84, 110.)

416

at 100.) Even then, however, these inmates do not receive proper care. The Bureau of Corrections medical director works in St. Croix, is available only for telephone consultations, and prescribes medication for the prisoners via telephone without first examining the patient or reviewing the medical chart. (Court Exh. 3, App. I, at 5.) Inmates are not transferred to local hospitals in emergency situations. (Court Exh. 3, at 63.)[20] Generally, logbooks cataloguing the status of mental health referrals are not maintained. (*Id.*)

■ Instead of segregating the mentally ill inmates from the general population, the CJC attempts to house the mentally ill together in clusters, often four to five inmates per cell.[21] Cluster 3, the formally designated holding cell for mentally ill pretrial detainees, is filthy and overcrowded. (Court Exh. 3, at 63.)[22] Acutely psychotic inmates, housed in inhumanly close quarters, are extremely aggressive and dangerous, both to themselves and others, and engage in extreme violence. (Court Exh. 3, App. I at 10; Tr. at 99.) Between March and November 1996, two inmates were beaten into comas and suffered severe, permanent neurological damage as a result of inmate-to-inmate[23] violence. (Tr. at 82, 163, 169. *See also infra* section III.F.) Indeed, the majority of inmate assaults occurs in Cluster 3, where inmates frequently beat each other and, in turn, are beaten by correctional staff. (Tr. at 167, 284.) Moreover, correctional staff taunt the mentally ill inmates in Cluster 3, "rewarding" inmates by throwing cigarettes at them after instructing them to pull down their pants and hold their crotch, crawl across the floor, or do push-ups. (Tr. at 103.)

The CJC also lacks segregation cells for inmates who require restraints, seclusion, or close observation. (Court Exh. 3, at 63, App. I at 11; Court Exh. 9, at 2.) To control disruptive mentally ill

---

[20] Mental health beds at the local hospital are unavailable for the sole use of inmates. (Court Exh. 3, at 64.)

[21] Approximately 10% of the CJC population is maintained on psychotropic drugs, while an even greater number of prisoners requires mental health care. (Court Exh. 9, at 6; Tr. at 96.)

[22] Mentally ill prisoners are not always segregated from the general population. (Court Exh. 3, at 63, App. I at 10; Tr. at 81.) Some are commingled with other, non-mentally ill inmates in other cells and clusters. (Court Exh. 3, at 63.)

[23] The court notes that there is an equally prevalent phenomenon of violence inflicted on prisoners by CJC correctional officers. *See infra* sec. III.F.

inmates, the defendants either lock down the prisoners with as many as four cellmates, (Tr. at 99.), or lock individual inmates into the "attorney visiting room," sometimes for time periods of three to six days. (Tr. at 101, 269-71, 273-74; Pl. Exh. 11-12.) The attorney visiting room, however, is isolated completely from the staff and central patrol area, and does not have a toilet. (Tr. at 102.) Mentally ill inmates impounded in the attorney visiting room are given a plastic container in which to urinate. (Tr. at 101, 269-70.) One inmate who was locked in the room for six days had to urinate and defecate on the floor. (Tr. at 102.)

The abominable treatment of the mentally ill inmates shows overwhelmingly that defendants subject inmates to dehumanizing conditions punishable under the Eighth Amendment.

### F. Corrections and Security

Prison officials must implement a classification system that separates dangerous inmates from others; otherwise, such officials deliberately disregard a substantial risk to the prisoners' basic safety and security. *See Farmer*, 511 U.S. at 842-46; *Barnes v. Government of the Virgin Islands*, 415 F. Supp. 1218 (D.V.I. 1976). When overcrowding and the commingling of mentally ill inmates with the general prison population contributes to inmate-to-inmate violence, moreover, failure to remedy the situation constitutes deliberate indifference. *Ryan v. Burlington County*, 708 F. Supp. 623, 633-35 (D.N.J.), *aff'd*, 889 F.2d 1286 (3d Cir. 1989).

In general, prison officials must monitor the inmates and confiscate weapons to ensure prisoners' health and safety. *Tillery*, 719 F. Supp. at 1256, 1276. Officials must protect prisoners from each other, as the Eighth Amendment forbids knowing disregard of excessive risk to the inmates' health and safety. *Farmer*, 511 U.S. at 842-46; *Frett v. Government of the Virgin Islands*, 839 F.2d 968, 978 (3d Cir. 1988). In addition, when prison officials themselves maliciously and sadistically use force, their acts implicate the Eighth Amendment and violate contemporary standards of de-

cency. *Hudson,* 503 U.S. at 9.[24] Finally, officials may not use restraints on mentally ill inmates as a matter of course; rather, they may restrain them only under special circumstances.

The CJC does not house inmates according to an objectively based classification system.[25] (Tr. at 242, 295, 318.) It also does not maintain separate housing facilities for violent inmates; instead, officials rely on group lock downs to discipline the inmates. (Court Exh. 3, at 66-67; Tr. at 157. *See also supra* section III.E.)[26] Moreover, prison officials do not monitor regularly the overcrowded cell areas through on-site rounds. (Court Exh. 9, at 5; Tr. at 82-83; 288.) Consequently, warring "posses" or gangs have developed, (Tr. at 318), and violent incidents are rampant: Ludrig Larsen, a Cluster 3 inmate who is incarcerated at the CJC because he did not take his psychotropic medication, was hospitalized after a brutal fight with another inmate. (Tr. at 164, 169.) Oliver McTavious, another Cluster 3 inmate, was beaten into a coma by one of his cellmates after McTavious drank water out of, bathed in, and washed his hair in the toilet and threw the toilet water onto his cellmate. (Tr. at 164, 166-67.[27] Still another Cluster 3 inmate named Ramos was attacked by a fellow prisoner who slashed Ramos's eye with a sharpened pen to the point that the eye required stitches. (Tr. at 164-66.) Pretrial detainee Thomas Lindsey's throat was slashed on October 30, 1996 by an inmate who should have been on "lockdown" but was not. (Tr. at 290, 322.) And pretrial detainee Leslie Demming set himself on fire. (Tr. at 322.)

In response to the inmates' violence, corrections officers routinely employ excessive force. (Court Exh. 9, at 5.) Indeed, the defendants lack a comprehensive "Use of Force" policy and

---

[24] Similarly, officials may not subject pretrial detainees to excessive force used maliciously and sadistically for the purpose of causing harm. *Williams v. Mussomelli,* 722 F.2d 1130, 1133 (3d Cir. 1983).

[25] While the CJC does separate male from female inmates and pretrial detainees from sentenced inmates, (Tr. at 155), it does not further classify these groups according to traditional security classifications of minimum, medium, and maximum. (Tr. at 156.)

[26] The absence of a classification system applies equally to the general prison population and to the mentally ill inmates.

[27] After this incident, inmate Rygal Watley, who had beaten McTavious so severely, was placed in a cell with a different inmate whom Watley proceeded to injure to the point of bleeding. (Tr. at 167.)

419

procedure. (Court Exh. 3, at 74, App. J.)[28] Consequently, control over "agitated" prisoners often involves the use of batons. (Tr. at 167.) Two female inmates, Donna Murray and Christine Charles, were restrained by correction officers and then beaten with a baton. The beating left welts on Murray's buttocks. According to an incident report, Charles, a psychotic inmate, was rude and disrespectful of the officers, who subsequently handcuffed and beat her. (Tr. at 172-74.) In other incidents, after restraining inmates with handcuffs, correction officers beat prisoners with a baton until the inmates were on the floor, crying, and bruised with numerous welts on their thighs. (Tr. at 175-76; see also Tr. at 167.)

Altogether, defendants' knowing failure to remedy serious shortcomings in CJC corrections and security measures does not protect the prisoners' basic needs of safety and security.[29] Thus, the defendants' conduct with respect to this aspect of the conditions of confinement also fails to meet minimal constitutional requirements.

### G. Compliance with Americans with Disabilities Act

The Americans with Disabilities Act (ADA) prohibits public entities from discriminating against qualified disabled individuals by "excluding them from participation in or . . . denying them the benefits of the services, programs, or activities of [the] public entity." *See* 42 U.S.C.A. § 12132 (West 1995). Correctional facilities are public entities falling under the dictates of the ADA. *See Duffy v. Riveland*, 98 F.3d 447, 455-56 (9th Cir. 1996) (inmate states cognizable claim under ADA).

The defendants have not complied with the ADA. (Court Exh. 3, at 82.) Prison officials house non-mentally ill inmates together with the mentally ill in Cluster 3. Inmate Hodge, who uses a cane but does not otherwise suffer from mental illness, was placed in Cluster 3 because officials regarded his cane as a security threat. (Tr. at 81.) Such action subjects the inmate to unnecessary and

---

[28] Assistant Warden George testified that inmates are restrained "to save somebody else['s] life." (Tr. at 286.)

[29] Defendants admit that they do not segregate violent inmates from others according to a classification scheme. They assert that they cannot do so because of the overcrowded conditions. (Tr. at 242, 295, 318-19.)

unwarranted risk of personal injury and does so for the sole reason of his disability. Thus, defendants violate the ADA.

## H. Religious Freedom

■ The Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb *et seq.*, forbids the government from imposing a substantial burden on the free exercise of religion without compelling justification. *See* 42 U.S.C.A. § 2000bb-1 (West 1994). The law applies to prisons and actions involving inmates. *Allah v. Menei*, 844 F. Supp. 1056, 1062 n.18 (E.D. Pa. 1994). Thus, prison officials may not curtail inmates' access to religious services or religious counselling.

Officials at the CJC do not allow pretrial detainees to attend religious services. (Court Exhs. 4-6; Tr. at 154, 295.) While the CJC has established written policies and procedures to provide religious programs to inmates and to allow inmates to groom themselves in accordance with their religious beliefs, it is unclear whether these programs have been implemented. (Court Exh. 3, at 81.) In the past, prison officials have not accommodated all inmates' desire to participate in religious services. (Court Exhs. 4-6.)

Defendants have not proffered a compelling reason for their failure to provide pre-trial detainees access to religious services. Thus, defendants impermissibly burden the detainees' right to exercise freely their religion.

## I. Legal Access

Prison officials must provide inmates with meaningful access to courts to enable inmates to challenge their criminal charge, conviction, or conditions of confinement. *Bounds v. Smith*, 430 U.S. 817, 824, 828, 52 L. Ed. 2d 72, 97 S. Ct. 1491 (1977). Meaningful access includes adequate law libraries and sufficient time to consult legal sources. *Tillery*, 719 F. Supp. at 1281-82; *Benjamin v. Potter*, 635 F. Supp. 243 (D.V.I. 1986), *aff'd*, 838 F.2d 1205 (3d Cir. 1988).

The law library at the CJC lacks recent volumes of legal reference materials and is not comprehensive. (Court Exh. 3, at 72.) At times, defendants allow library access on an ad hoc basis and only to

sentenced inmates. (Court Exh. 4, at 34 & Exh. B at 10.)[30] This practice violates the inmates' right to meaningful access to the courts.

## J. Mail, Telephone, and Visitation

■ Prisoners also must be afforded reasonable access to telephones. *Inmates of Allegheny County Jail v. Wecht*, 565 F. Supp. 1278, 1284 (E.D. Pa. 1983). Unreasonable restrictions on telephone access may violate the First and Fourteenth Amendments, *id.*, or impede meaningful access to courts. *See Tucker v. Randall*, 948 F.2d 388, 390-91 (7th Cir. 1991); *Owens-El v. Robinson*, 442 F. Supp. 1368, 1386 (W.D. Pa. 1978). Penal institutions may censor outgoing legal mail only in the interest of prison security, institutional order, or rehabilitation. *Todaro v. Bowman*, 872 F.2d 43, 49 (3d Cir. 1989) (requiring substantial government interest).

Plaintiffs contend that defendants restrict the number of telephone calls an inmate may make. Further, they claim that they must present to correctional officers outgoing legal mail in unsealed envelopes. (Compl. at PP 118-19.) CJC procedures or policies with regard to telephone access are absent from the record. *Id.*; see also Court Exh. 4, at 34. Inmates' rights to attorney-client privacy with regard to written correspondence are not being abridged, however, and stamps are provided to indigent inmates. (Court Exh. 3, at 81.) Thus, this court finds that defendants' conduct with regard to the inmates' mail, telephone, and visitation rights meets minimal requirements.

## K. Miscellaneous Provisions Regarding Expansion of the CJC

Reviewing the facts supporting the court's conclusions with respect to the population level at CJC, the court finds that the provisions in the Agreement acknowledge the potentially fortuitous relationship between the overcrowded conditions and the availability of both a separate Annex—or Halfway House—and the second floor of the CJC building. That is, the available space proximate to the CJC could help remedy the problems created by

---

[30] Library sign-in logbooks indicate that few inmates use the facility. Over a period of four months, 20 inmates had signed the logbook. (Tr. at 120.)

the unconstitutional conditions within the CJC. To that end, while the defendants have attempted to utilize the space available on the second floor of the CJC building,[31] they have not occupied the space for institutional purposes. The Government of the Virgin Islands—in particular the judiciary and the police—owns, but does not occupy, the facility which remains vacant on the second floor, nor makes it available to correct the unconstitutional space violations. (Tr. at 209, 226-27, 249.)

## IV. The Agreement: Appropriate Relief for Unconstitutional Conditions of Confinement at the CJC

 Principles of federalism require a federal court to allow state and local governments to resolve state and local disputes wherever possible, so long as such resolution does not implicate federal laws. To that end, courts must "formulate the least intrusive means to correct [an alleged] constitutional harm." *Tillery*, 907 F.2d at 425 (citing Milliken v. Bradley, 433 U.S. 267, 280-81, 53 L. Ed. 2d 745, 97 S. Ct. 2749 (1977)). In the context of an institutional reform consent decree, courts may adjudge whether prison conditions meet constitutional standards, but should defer to local government administrators to implement the agreement purporting to achieve and maintain such standards. *See id.*

The findings of fact set forth herein support the legal conclusion that the present conditions of confinement at the CJC violate the Eighth and Fourteenth Amendments to the Constitution. The Agreement purports to remedy these violations. Moreover, its terms are necessary to remedy the problems that plague the CJC, as set forth in plaintiffs' complaint and as proven at the proceedings before this court.[32] *Cf. James v. Lash*, Nos. S 73-5 Mass. Adv. Sh. 3687, 1996 WL 738957, *2 (Dec. 13, 1996 N.D. Ind.) (construing 18 U.S.C. § 3626(b)(3) as requiring finding of current or ongoing violation of federal right to determine that relief provided by consent judgment remains necessary).

The court recognizes the autonomy of the local government to remedy a local problem, albeit a local problem with grave, consti-

---

[31] The Bureau of Corrections has asked architects, engineers, and designers to assess the area in terms of necessary security measures and electrical and plumbing needs. (Tr. at 209.)

[32] Defendants themselves agree with these conclusions. (Tr. at 194.)

tutional implications. To that extent and in consideration of the factual findings of this opinion, the court has reviewed the Agreement and, as previously indicated herein, finds that it comports with the principles of the PLRA: it is narrowly drawn, extends no further than necessary to correct the violation of the federal right, and is the least intrusive means necessary to correct the violation.

## V. Defendants are in Contempt of the Court's Orders

### A. Orders to Enforce the Agreement

On October 13, 1995, the court ordered the defendants to house inmates on the unused second floor of the CJC building to alleviate the excessive overcrowding at the jail. On October 17, 1995, the court entered another order to enforce the Agreement entered into by the parties in this matter. This order demanded that defendants comply with the terms of the Agreement to effectuate necessary population reduction at the CJC and raise the then substandard conditions of confinement to a constitutional minimum. At present, the CJC population remains excessively high; thus, the facility remains exceedingly overcrowded.[33] To date, the second floor of the CJC building has not been utilized. The conditions of confinement at the CJC also continue to fall far short of very basic, minimum habitability. More important for purposes of plaintiffs' present motion, defendants have not made adequate efforts to remedy the critical issues they must face, both under orders of the court and according to the agreement to which they bound themselves.

■ Plaintiffs ask this court to hold defendants in contempt of court. *See Spallone v. United States,* 493 U.S. 265, 276, 107 L. Ed. 2d 644, 110 S. Ct. 625 (1990) (court can invoke civil contempt power to enforce its orders); *Harris v. City of Philadelphia,* 47 F.3d 1333 (3d Cir. 1995). Plaintiffs must prove contempt by clear and convincing evidence. *Robin Woods Inc. v. Woods,* 28 F.3d 396, 399 (3d Cir. 1994). To preclude a finding of contempt, in turn, the defendants must

---

[33] In September 1996, the CJC housed 202 pre-trial detainees and sentenced inmates. (Pl. Exh. 5.)

demonstrate—not by mere assertions but by presenting evidence—that they have taken "all reasonable steps" toward compliance. *Harris*, 47 F.3d at 1323-24. Mere good faith efforts do not suffice. *Robin Woods*, 28 F.3d at 399; *Harley-Davidson Inc. v. Morris*, 19 F.3d 142, 148-49. (3d Cir. 1994). *See also McComb v. Jacksonville-Paper Co.*, 336 U.S. 187, 191, 93 L. Ed. 599, 69 S. Ct. 497 (1949) (finding of contempt appropriate even if failure to comply with court order not intentional); *Robin Woods Inc.*, 28 F.3d at 399 (willfulness not element of civil contempt; good faith not defense). Indeed, evidence of good faith is relevant only to gauge the extent of contempt sanctions. *Harley-Davidson*, 19 F.3d at 148. *See also infra* sec. VII. for discussion of contempt sanctions.

Defendants acknowledge both familiarity with and necessity for the terms of the Agreement. Defendants also admit that they never fully complied with the court orders enforcing these terms and that they knowingly violated the orders. (Tr. at 199-201; 208-09, 263.) Defendants have participated in ongoing efforts to monitor and improve the living conditions at the CJC, and concur with the findings of the Special Master and other experts who have evaluated this matter. Thus, considering the substance and tenor of experts' findings that conditions at the CJC do not meet minimal requirements, defendants have acknowledged these shortcomings but have not actually remedied them.

In specific, defendants have not devised a classification system categorizing inmates according to certain factors to both aid in their segregation of inmates and assist in an ultimate plan to reduce the CJC population. (Court Exh. 3, App. D, J.) Nor have defendants transferred any CJC prisoners to other correctional facilities to alleviate the serious overcrowding at the CJC. (Tr. at 239.)[34] Indeed, defendants have never reduced the CJC population

---

[34] Defendants argue that they have not transferred inmates to the Golden Grove correctional institution on St. Croix because of a Consent Decree with population restrictions governing that facility. The court recognizes the catch-22 implications of the scenario presented by defendants; however, it must also note and find that defendants knowingly violate the Agreement governing the CJC to comply with other requirements.

to 97 inmates.[35] As recently as September 1996, the CJC housed 202 inmates. (Pl. Exh. 5.)

In sum, defendants have not made any meaningful progress toward reducing the inmate population.

■ Within the CJC facility, too, defendants have not complied sufficiently with the requirements set forth in the Agreement. For instance, mentally ill pretrial detainees remain housed in the grossly overcrowded conditions of Cluster 3. (See Court Exh. 3, App. I.) Shelter, physical plant, and environmental problems persist, as evidenced by photographs of the CJC taken on a recent tour of the facility in which both parties' counsel, the Special Master, and Magistrate Judge Geoffrey Barnard participated.[36] As of October 1996, the roof and hot water heater had not been repaired. (Court Exh. 3, at 5; Tr. at 305.) Lack of security measures still permit violent assaults to occur—on the very day of the tour in which Judge Barnard participated, pretrial detainee Thomas Lindsey's throat was slashed by an inmate. (Tr. at 290, 322.) Altogether, these conditions provide clear and convincing evidence that defendants have not complied with the court's order and are, thus, in contempt.

Moreover, to the extent that defendants have improved some of the conditions of confinement, the court cannot characterize these isolated efforts as "all reasonable steps," *see Harris*, 47 F.3d at 1323-24, toward achieving compliance. For instance, the defendants exterminated the kitchen and guard areas and had the water facility tested in October 1996. (D. Exhs. 2, 8.) Such effort is commendable at first blush, but loses its effect in the absence of a showing that the defendants furnish such treatment on a regular basis for the entire facility. Similarly, while defendants allege to have sought bids for the roof repair, no vendor was ever contracted or actual work performed. And while the facility keeps on file a manual, "Management of Offenders with Mental Health Problems," see D. Exh. 7, there is no evidence to suggest that defen-

---

[35] Between January 1995 and October 1996, the average daily population ranged from 169 to 194. (Pl. Exh. 5.)

[36] These photographs were admitted as evidence at the hearing on November 7 and 8, 1996. (See Pl. Exh. 1.)

dants implement a particular policy regarding appropriate control over mentally ill inmates.

Defendants contend that their non-compliance is justified—and the charge of contempt precluded—by an absolute inability to effect the required change in light of both monetary and environmental constraints.[37] Defendants argue that unforeseen weatherstorms caused an unexpected financial crisis of such proportion that the coffers of the government could not sustain the costs required to implement the Agreement. In addition, the defendants contend that the Bureau of Corrections itself maintains a five million dollar debt that paralyzes the Bureau's ability to relieve the overcrowding by transferring inmates to other facilities which, in turn, would charge the Bureau for such transfers.

 Insufficient financial means, however, do not "justify the . . . perpetuation of constitutional violations." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 392, 116 L. Ed. 2d 867, 112 S. Ct. 748 (1992). In the context of prison litigation in which plaintiffs allege unconstitutional conditions of confinement, "lack of financing is not a defense to the failure . . . to provide minimum constitutional standards in [the] operation of a . . . jail." *Inmates of Allegheny County Jail v. Wecht*, 699 F. Supp. at 1146. Moreover, the testimony of defendant York indicates that the defendants do not suffer from a complete lack of financing.[38]

Defendants' attempt to excuse their noncompliance by suggesting that hurricanes and other severe weatherstorms were unforeseeable catalysts of an economic crisis is similarly unavailing. Hurricanes and other inclement weather are certainly foreseeable in the Virgin Islands. Moreover, the defendants' failure to comply with the terms of the Agreement predates Hurricane Marilyn and other storms that have passed through the Virgin Islands to date. In June 1995 already, Magistrate Judge Resnick found that defendants were not in substantial compliance with the Agreement. And on October 17, 1995, this court determined that "the Defendants

---

[37] Defendant Elwood York, Director of the Bureau of Corrections testified that "there are things and people who control things outside of our powers." (Tr. at 260.)

[38] Significant amounts of money from, for example, the Interior Fund—under the control of the Department of Justice, have not been expended to comply with the court's orders. (Tr. at 234-35.)

have substantially failed to comply with many provisions of the Consent Decree."

Thus, the evidence shows and the court finds that all defendants are in contempt of the court's orders to enforce the Agreement.

## B. Order to Pay Attorneys' Fees

Pursuant to this court's order dated October 5, 1995, defendants were directed to pay plaintiffs' attorney fees in the amount of $155,000 to satisfy plaintiffs' Motion and Supplemental Motion for Reasonable Attorneys' Fees and Expenses through July 14, 1995. Because defendants had already remitted to plaintiffs $50,000 pursuant to an earlier court order dated March 30, 1995, the October 5 order directed defendants to pay the balance ($105,000) to plaintiffs' counsel within sixty days. To date, defendants have not paid the outstanding balance; thus, since December 5, 1995, defendants have been in continuing violation of the court's order.

Plaintiffs ask this court (1) to find defendants in contempt of the court order to pay plaintiffs' attorney fees; and (2) to compel defendants to comply with the October 5 order pursuant to Fed. R. Civ. P. 70. That rule provides an equitable remedy for non-performance of a judgment for specific acts, and does not apply ordinarily to enforcement of monetary judgments.[39] *See Arnold v. BLaST Intermediate Unit 17*, 843 F.2d 122, 128 n.11 (3d Cir. 1988). However, in exceptional cases such as this one, "where state intransigence precludes the enforcement of [a money] judgment through [other] procedures," a court will compel payment pursuant to Rule 70. Id.

Defendants' knowing and continued non-compliance with the court's October 5 order warrants a finding of civil contempt. Defendants have not paid plaintiffs more than $50,000 of court-ordered fees; they have not appealed effectively to other sources that might generate the fiscal capacity to help them comply with

---

[39] Fed. R. Civ. P. 70 provides, in pertinent part, "If a judgment directs a party to . . . perform any . . . specific act and the party fails to comply within the time specified, the court may direct the act to be done at the cost of the disobedient party by some other person appointed by the court. . . . The court may also in proper cases adjudge the party in contempt."

the court's order. (Tr. at 329.)[40] In fact, defendants have chosen not to pay the court-ordered fees despite court orders and repeated requests by plaintiffs to recover their funds. (Tr. at 325, 329, 333.) While defendants contend that they lack the resources to satisfy the judgment, evidence of sizeable appropriations and payments for other purposes belie such an assertion. (Tr. at 334-35.) Defendants thus appear unwilling to comply with this court's judgment and order. In such an instance, "federal courts are not reduced to issuing [judgments] against state officers and hoping for compliance." *Gates v. Collier*, 616 F.2d 1268 (5th Cir. 1980) (quoting Hutto v. Finney, 437 U.S. 678, 690, 57 L. Ed. 2d 522, 98 S. Ct. 2565 (1978)) (emphasis added).

## VI. Modification of the Agreement

Defendants ask this court to modify the Agreement because of "unforeseeable and unbudgeted financial setbacks" caused by extreme inclement weatherstorms. Defendants assert that they have made a good faith effort to comply with the Agreement, especially with those terms of the Agreement that did not strain significantly the defendants' budget for the CJC. Defendants submit, however, that their ability to fulfill all terms of the Agreement was frustrated by unforeseeable circumstances. Indeed, defendants state that they can neither reduce the population at the CJC nor provide psychiatric evaluation, care, or treatment to CJC inmates according to the terms of the Agreement without fiscal assistance from the Virgin Islands legislature. Thus, they contend that modification of the Agreement is appropriate under Fed. R. Civ. P. 60(b)(1).[41]

---

[40] Defendants did take preliminary steps to pay plaintiffs in December 1995. (Pl. Exh. 17; Tr. at 326.) After learning, however, that the court-ordered fees could be paid from an existing fund without special legislative appropriation, they did nothing further and, more importantly, did not pay the attorney fees. Defendants suggested that that existing fund could not support plaintiffs' judgment in light of other judgments that had allegedly already attached to the fund. (Tr. at 328.) After learning this, however, defendants made no further efforts to pay plaintiffs with monies from other sources. (Tr. at 329.)

[41] Fed. R. Civ. P. 60(b)(1) provides, in pertinent part, "the court may relieve a party . . . from a final judgment, order, or proceeding for the following reasons: mistake, inadvertence, surprise, or excusable neglect[.]"

In *Rufo v. Inmates of Suffolk County Jail*, the Supreme Court provided guidance in determining whether to modify a consent decree. According to *Rufo*, "a party seeking modification . . . bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Id.* at 760. Circumstances that the parties anticipated at the time they entered into the agreement will not support later modification of the decree. *Id.* If the movant establishes a significant change, however, he must also show that compliance with the original decree is "more onerous," "unworkable," or "detrimental to the public interest" in light of the changed circumstance. The court, then, must also determine that the proposed modification "is suitably tailored to the changed circumstance." *Id.*

Defendants' reliance on Small v. Hunt to argue that this court should modify the Agreement is inapposite. In Small, the court modified a consent decree similar to the one in this case, based on Fed. R. Civ. P. 60(b)(5) and a finding that there had been a significant change in factual circumstances. *Small*, 98 F.3d at 796-97. The court's holding, however, was supported by additional finding that, at the time the state of North Carolina sought modification of the decree, it had complied with almost all provisions of the decree other than the one it asked the court to modify. *Id.* at 793. Indeed, the Small court noted throughout its opinion the numerous and significant accomplishments the state had achieved in implementing the decree,[42] stating that since the time of the decree, "the state

---

Defendants rely primarily on *Small v. Hunt*, 98 F.3d 789 (4th Cir. 1996) to support their motion for modification. The court notes that Small construes Fed. R. Civ. P. 60(b)(5). Indeed, in their Opposition to Defendants' Motion for Modification of Consent Decree, plaintiffs argue against modification pursuant to Fed. R. Civ. P. 60(b)(5). That rule provides that a court may relieve a party from a final judgment when "the judgment has been satisfied, released, or discharged, or otherwise vacated, or it is no longer equitable that the judgment should have prospective application[.]" Fed. R. Civ. P. 60(b)(5). For purposes of the present motion, however, the distinction is immaterial by virtue of the court's finding with regard to modification.

[42] To comply with the consent decree, the Small defendants (1) effected a state enactment of a prison cap; (2) appropriated $500 million dollars to construct new prisons; (3) expanded and created non-institutional rehabilitative programs to enable the supervised release of inmates; and (4) effected the enactment and accelerated implementation of legislation regarding sentencing. *Id.* at 792. *See also id.* at 793 (noting North Carolina spent nearly $500 million dollars to comply with decree before seeking modification).

has been operating a secure and humane prison system, substantially above minimum constitutional requirements." Id.

Defendants in the present matter appeal to this court under far different and less compelling circumstances. Their compliance with the terms of the Agreement, while avowedly attempted in good faith, has been marginal at best. Repeated critical evaluations by the Special Masters and supplemental post-decree complaints regarding continued constitutional violations evince little, if any, improvement in the conditions of confinement at the CJC. Indeed, the evidence produced before the court in November 1996 demonstrates the opposite and supports a finding that, to date, the CJC is not a humane prison and does not provide minimum constitutional living conditions. Moreover, there is no evidence to suggest that defendants have even attempted to effect systemic change by advocating for legislative assistance and support in implementing the terms of the Agreement, as the North Carolina defendants did in Small. *See supra* n. 33.

Finally, the fact that severe weatherstorms occurred and allegedly caused a significant financial crisis does not itself establish a significant change in circumstances to warrant modification of the Agreement. According to the Agreement, the parties acknowledged and contemplated the occurrence of certain happenings at the time they committed themselves to the Agreement. To that end, the parties anticipated substantial increases or decreases in the cost of complying with the Agreement. (Agreement at 1-2.) The parties also agreed that "[a] condition or eventuality within the contemplation of the parties shall not be grounds for seeking an equitable modification [of the Agreement] under F.R.C.P. 60(b)(5)." *Id.* Thus, both under the Rufo standard and according to the terms of the Agreement, the reasons proffered by defendants to modify the Agreement cannot support such modification at the present time.[43]

---

[43] Because defendants have not established a significant change that would warrant modification of the Agreement, the court need not reach the second prong of Rufo to evaluate whether defendants' proposed modifications are "suitably tailored to the changed circumstance." *See Rufo*, 502 U.S. at 391. Indeed, defendants merely propose that the court extend the deadline to implement the population cap to December 1, 1997. The court notes, however, that defendants propose in their Supplemental Motion

## VII. Remedies

 The court may impose fines in conjunction with a civil contempt finding. These fines may be payable to the complainant as compensation caused by defendants' noncompliance. *Roe v. Operation Rescue*, 919 F.2d 857, 868 (3d Cir. 1990). Alternatively, the fines may be payable to the court. *Id.* The latter fines may be avoided if defendant complies with the court order—or, in this case, the Agreement. *See id.* In the context of prison litigation and corresponding consent decrees, courts have imposed substantial fines for failure to comply with orders to remedy prison over-crowding and unconstitutional conditions of confinement. *Inmates of Allegheny County Jail v. Wecht*, 901 F.2d 1191, 1200 (3d Cir. 1990) ($25,000 fine); *Morales Feliciano v. Parole Board of the Commonwealth of Puerto Rico*, 887 F.2d 1 (1st Cir. 1989), *cert. denied*, 494 U.S. 1046, 110 S. Ct. 1511, 108 L. Ed. 2d 646 (1990).

A court may also require the contemnor to perform affirmative acts, even acts not required by the initial consent decree. *See In re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1150, 1159 (3d Cir. 1982). In the context of prison litigation, courts in this circuit have ordered affirmative acts such as early release of inmates to achieve court-ordered prison population reductions. *Essex County Jail Inmates v. Amato*, 726 F. Supp. 539 (D.N.J. 1989); *Inmates of Allegheny County Jail v. Wecht*, 573 F. Supp. 454 (W.D. Pa. 1983).

Plaintiffs ask this court to fine defendants in amount of $200 per day for every day the CJC population exceeds the court-ordered capacity. Plaintiffs request an additional $100 fine for every day defendants do not comply with each provision of the Agreement. Such fines would help defray the cost of post-judgment monitoring of defendants' compliance with this court's order.

Plaintiffs also request that this Court order the release of each CJC prisoner who is within one year of his maximum release

---

for Modification of Consent Decree four solutions to help remedy the matter before the court. Although phrased as proposed modifications of the Agreement, the defendants' suggestions in fact represent proposed directives that the court would issue to enforce the existing Agreement. To the extent that Fed. R. Civ. P. 70 permits the court to direct compliance with a judgment of a specific act, the court will consider defendants' proposals and, where appropriate, incorporate them in its order.

432

date.[44] In addition, plaintiffs ask this court to enjoin defendants from admitting to CJC pre-trial detainees whose bail is set at less than $5,000 or who have been charged only with violation of immigration laws.

Finally, plaintiffs request that the court order defendants to pay plaintiffs' court-ordered attorneys fees in the amount of $105,000, plus interest and fines for every day defendants violate the court's order.[45]

To the extent that defendants have not stated a position as to the amount and type of sanctions the court should apply, the court will defer ruling on the appropriate remedy applicable in this matter. Defendants claim to have exercised good faith in complying with the Agreement and the orders to enforce same. As noted previously, good faith does not affect this court's determination that defendants are in civil contempt for defying the court's orders. *See supra* sec. V. However, evidence of good faith may affect the court's calculation of contempt sanctions that it will impose on defendants. *See Harley-Davidson*, 19 F.3d at 148.

## VIII. Conclusion

■ For the foregoing reasons, the court concludes that the defendants are in contempt of court orders entered to enforce the Agreement between the parties in this matter and the court order to pay plaintiffs' attorney fees. The court also denies the defendants' motion to modify the Agreement. An appropriate order follows. That order also sets forth the manner in which the court will determine the appropriate sanction to apply in this matter.

DATED this 29th day of January, 1997.

---

[44] The court notes that 18 U.S.C. § 3626(a)(3) restricts its power to issue an order releasing prisoners and establishes several prerequisites to doing so.

[45] Pending before this court, in addition to the motions addressed in this opinion, are two separate motions relating to reasonable attorneys' fees. The court will address Plaintiffs' Second and Third Supplemental Applications for Reasonable Attorneys' Fees and Costs in a separate order. At present, however, the court notes that failure to pay additional court-approved attorneys fees will expose defendants to additional contempt citations and sanctions.

## ORDER

THIS MATTER having come before the court on two related motions: (1) the motion of the defendants, Alexander A. Farrelly, et al., to modify the Settlement Agreement in this matter pursuant to Fed. R. Civ. P. 60(b); and (2) the motion of the plaintiffs, Lawrence Carty, et al., requesting the court to hold defendants in civil contempt and impose sanctions for failure to comply with this court's orders regarding the Settlement Agreement and related attorneys' fees;

The court having held an evidentiary hearing on November 7 and 8, 1996 on plaintiffs' and defendants' motions;

The court having considered the submissions of the parties; and

For the reasons set forth in the court's opinion of this date;

IT IS on this 29th day of January, 1997;

ORDERED that defendants' motion to modify the Settlement Agreement is DENIED; and IT IS FURTHER

ORDERED that plaintiffs' motion to hold defendants in civil contempt is GRANTED; and IT IS FURTHER

ORDERED that defendants shall pay the balance of the previously awarded counsel fees in the amount of $ 105,000 to the National Prison Project of the American Civil Liberties Union Foundation by March 1, 1997; and IT IS FURTHER

ORDERED that, plaintiffs having already advised this court as to the sanctions they demand, defendants shall serve this court and plaintiffs' counsel by February 20, 1997 with their position regarding the amount and type of contempt sanctions the court should impose, with plaintiffs to file their reply thereto by March 10, 1997; and IT IS FURTHER

ORDERED that the issue of contempt sanctions shall be heard on April 1, 1997 at 9 a.m. at the District Court of the Virgin Islands, Charlotte Amalie, St. Thomas, U.S.V.I.