Lawrence CARTY, et al., Plaintiffs,

v.

Charles W. TURNBULL, et al., Defendants.

No. CIV. A. 94–78.

District Court, Virgin Islands, St. Thomas Division.

June 4, 2001.

Eric Balaban, Washington, DC, for Plaintiffs.

Benjamin Currence, St. Thomas, USVI, for Plaintiffs.

Richard Schrader, Jr., Assistant Attorney General, Virgin Islands Department of Corrections, Christiansted, St. Croix, USVI, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON CONTEMPT MOTION

BROTMAN, District Judge.

This matter is before the Court, on its own motion, for consideration of whether Defendants should be held in civil contempt of a settlement and related Court orders that were designed to remedy unconstitutional conditions at the Criminal Justice Complex and Annex in St. Thomas, U.S. Virgin Islands. Upon consideration of the parties' submissions, testimony presented at the December 20, 2000, contempt hearing, and other matters of record, the Court herein issues findings of fact and conclusions of law regarding Defendants' compliance with the settlement provisions and subsequent Court orders.

## I. *FINDINGS OF FACT*

### A. Background

1. The plaintiffs in this case, pretrial detainees and inmates at the Criminal Justice Complex ("CJC"), filed a class action complaint and motion for a preliminary injunction on June 20, 1994, alleging unconstitutional conditions of confinement at the jail. Plaintiffs named various Virgin Islands officials, including the governor, attorney general, director of the Bureau of Corrections ("BOC"), and the CJC's warden and assistant warden, as defendants.

2. The parties signed a Settlement Agreement ("Agreement") on October 12, 1994, which this Court entered as an order on December 7, 1994. The Agreement requires Defendants to make specific improvements, by dates certain, in the following aspects of operations and conditions at the CJC: (a) population; (b) shelter, physical plant, and environmental health; (c) fire safety; (d) medical care; (e) mental health; (f) corrections and security; (g) compliance with the Americans with Dis-

abilities Act; (h) religious freedom; (i) legal access; and (j) mail, telephone, and visitation.

3. To monitor compliance with the Agreement, the Court appointed a Special Master, who held hearings, conducted inspections, and produced reports on conditions at the CJC and Defendants' efforts to satisfy the terms of the Agreement. The last Special Master's term of service ended June 30, 1999.[1]

4. Plaintiffs filed a contempt motion on January 11, 1996, alleging that Defendants had failed to comply with the Agreement and two related orders the Court had entered in October 1995.[2] Defendants filed a cross-motion to modify the Agreement, pursuant to Federal Rule of Civil Procedure 60(b), on the basis of unforeseen financial setbacks resulting from extreme weather in the Virgin Islands. Following a hearing on the parties' motions on November 7–8, 1996, the Court issued a comprehensive decision denying Defendants' motion and holding Defendants in contempt. *Carty v. Farrelly*, 957 F.Supp. 727, 743 (D.Vi.1997) (*Carty I* ). The Court found that "[t]he conditions of confinement at the CJC ... continue to fall far short of very basic, minimum habitability ....  [and] defendants have not made adequate efforts to remedy the critical issues they must face, both under orders of the court and according to the agreement to which they bound themselves." *Id.*

5. On April 1, 1997, the Court held a separate hearing on Plaintiffs' request for contempt sanctions. In a subsequent opinion, the Court declined to order monetary sanctions against Defendants, crediting the Virgin Islands government's post-hearing efforts to alleviate overcrowding at the CJC, and reasoning that monetary sanctions would not coerce Defendants to comply with the Agreement. *Carty v. Schneider*, 986 F.Supp. 933, 937–41 (D.Vi. 1997) (*Carty II* ). The Court noted that "while ... monetary sanctions are inappropriate at this juncture, a failure to maintain the momentum generated by defendants' recent achievements—and a corresponding failure to achieve compliance with the substantive terms of the Agreement in the near future—will affect the court's response to prospective motions for relief that may be brought by the plaintiffs." *Id.* at 941.

6. Between 1997 and 1999, medical and environmental health experts and the Special Master documented serious continuing hazards at the CJC and its new halfway house facility, commonly referred to as the "Annex." On October 21, 1999, the Court *sua sponte* ordered Defendants to appear for a hearing on December 9, 1999, to show cause why they should not be held in contempt for their failure to comply with the Agreement. At the hearing, Defendants agreed to take concrete steps to

---

1. Magistrate Judge Jeffrey Resnick served as special master from December 1994 to April 1996, and filed a report, adopted by the Court on October 17, 1995, documenting conditions at the CJC. *Carty v. Farrelly*, 957 F.Supp. 727, 732 n. 5 (D.Vi.1997). Darlene Grant then replaced Judge Resnick, and served as special master until June 30, 1999. During her tenure, Ms. Grant produced seven additional reports on conditions at the CJC and Defendants' efforts to comply with the Agreement.

2. On October 13, 1995, the Court entered an order directing Defendants to house prisoners on the second floor of the CJC to alleviate the overcrowding in the jail. On October 17, 1995, the Court entered another order finding Defendants in violation of the Agreement, and directing Defendants to comply with the Agreement to reduce the jail population and to "raise the then substandard conditions of confinement to a constitutional minimum." *Carty v. Farrelly*, 957 F.Supp. 727, 743 (D.Vi. 1997).

address several of the more dangerous conditions at the CJC.

7. Since the date of the contempt hearing, the Court has held status conferences roughly once a month to track Defendants' compliance with the Agreement and remedial orders.[3] Additionally, pursuant to an order of the Court, Defendants have provided Plaintiffs with monthly documentation related to their compliance with the Agreement.

8. On August 2, 2000, this Court, accompanied by the Virgin Islands attorney general, BOC director, the warden and assistant warden, and counsel for both parties, conducted a tour of the CJC and Annex, followed by a hearing. The Court admonished Defendants that the deadlines for satisfying the terms of the Agreement had long since passed, and that it would consider ordering contempt sanctions in the event of continued non-compliance. The Court then entered a remedial order, requiring Defendants to make specific improvements, by dates certain, in the areas of fire safety and security, Annex construction, legal access, maintenance, environmental health, personal hygiene, and recreation. (*See* Order of Sept. 7, 2000.)

9. On the basis of subsequent status conferences, the Court has entered additional remedial orders with respect to specific aspects of CJC operations. (*See* Order of Nov. 27, 2000 (fire evacuation plans and interdepartmental memorandum of understanding regarding roles in emergencies); Order of Sept. 20, 2000 (medication distribution)).

**B. Compliance with the Court's Orders**

10. On October 17, 2000, the Court entered a scheduling order setting this case for a contempt hearing on December 20, 2000. At that hearing, the Court heard testimony from the environmental health and medical experts, jail and Government officials, and representatives of the U.S. Marshal's Service. The Court also received into evidence the declarations of fourteen prisoners at the CJC and Annex, signed in the week preceding the hearing.

11. Although the contempt matter was before the Court on its own motion, the Court relied on Plaintiffs' counsel, which has had the lead monitoring role in this case since the departure of the Special Master, to identify those areas of compliance for which a contempt finding might be appropriate. Thus, this opinion treats solely with the aspects of CJC and Annex operations raised by Plaintiff.[4]

12. On the basis of the evidence presented at the hearing, as well as the entire record of the case,[5] the Court makes the following determinations regarding Defendants' compliance with the Agreement and

---

3. The Court has treated these monthly status conferences as continuations of the December 9, 1999 contempt hearing.

4. The following provisions of the Agreement are not at issue in this contempt proceeding: (a) population; (b) the food service and clothing provisions of the environmental health section; (c) medical care, except with respect to medication distribution; (d) corrections and security, except with respect to recreation time; (e) compliance with the Americans with Disabilities Act; and (f) religious freedom.

5. Defendants have also included a number of factual representations, without citation to materials of record, in their Proposed Findings of Fact and Conclusions of Law. Because these statements constitute, in several instances, the latest information on conditions at the CJC and Annex, the Court references them where relevant. Nonetheless, the Court does not give them the same credence as sworn testimony, documentary evidence, and experts' reports.

subsequent remedial orders.[6]

*Shelter, Physical Plant, and Environmental Health*

13. The Agreement requires Defendants to establish a comprehensive preventive maintenance plan for all mechanical systems and the physical plant by January 1, 1995. (Agreement ¶ II.11.)[7] To execute this plan, the Agreement further requires Defendants to hire two full-time-equivalent workers qualified to perform maintenance work on all major mechanical systems by April 15, 1995. (*Id.* ¶ II.13.) In the area of environmental health, Defendants are required to provide personal hygiene articles to prisoners at the time of admission, and to reissue such items as needed, by January 1, 1996. (*Id.* ¶¶ II.35, II.37.) Defendants must replace damaged or soiled mattresses by April 15, 1995 (*id.* ¶ II.6), and establish a mattress exchange program for new admissions by December 1, 1994 (*id.* ¶ II.7.)[8]

14. In 1997, the Court held Defendants in contempt of the Agreement's shelter, physical plant, and environmental health provisions. *See Carty I,* 957 F.Supp. at 735–736, 744–45. The Court noted: "The CJC lacks a preventive maintenance program—its roof leaks; light fixtures and hot water heaters for inmate showers are non-functional; mattresses are soiled, damaged, and not exchanged regularly .... The ventilation system at the CJC does not function properly ....

[and][s]hower areas leak ...." *Id.* at 736 (footnotes and citations omitted). The Court also found that "CJC staff ... do not distribute regularly the necessary personal hygiene items such as toothpaste and sanitary napkins; rather, they issue them selectively in order to discipline inmates." *Id.* at 738. Post-contempt conditions with respect to preventive maintenance, hygiene articles, and mattresses are described in paragraphs 15–27, *infra.*

15. *Preventive Maintenance:* James Balsamo, Plaintiffs' environmental health expert, inspected the CJC and Annex in May 1998, and found that both facilities continued to suffer from a litany of environmental problems, including "inadequate ventilation, inadequate hot water in showers and lavatories ... improperly functioning toilets and lavatories, inadequate insect and rodent control, inadequate lighting, a lack of preventive maintenance due to staffing shortages, [and] a lack of overall health and safety policies, procedures, practices, and training." (James J. Balsamo, Jr., Environmental Health and Safety Survey of St. Thomas Criminal Justice Complex and Annex on May 22, 1998, at 1 [hereinafter Balsamo, May 1998 Report].[9])

16. Through 1999, Mr. Balsamo's inspections found that Defendants had neither instituted a preventive maintenance program nor hired additional staff to supplement the efforts of the one maintenance worker at the CJC and Annex. (*See*

---

**6.** For convenience of analysis, the Court will divide its findings largely among the same categories—fire safety, mental health, legal access, and so on—that are utilized in the Agreement.

**7.** In addition to requiring implementation of a maintenance program, the Agreement mandates specific remedial actions, including repairs or upgrades to the roof, sinks, light fixtures, hot water heaters, and drinking water system. (*Id.* ¶¶ II.1 to II.4, II.13.)

**8.** Additionally, the Agreement's fire safety provisions include requirements that all foam mattresses be replaced with fire-retardant mattresses by November 1, 1994 (*id.* ¶ III.6), and that all damaged fire-retardant mattresses be replaced by January 1, 1995 (*id.* ¶ III.7).

**9.** Mr. Balsamo's report is appended to Response to Plaintiffs' and Defendants' Objections to Special Master Report No. 6 (June 10, 1998).

James J. Balsamo, Jr., Environmental Health and Safety Survey of St. Thomas Criminal Justice Complex and Annex on February 5, 1999, at 14–16 [hereinafter Balsamo, February 1999 Report]; [10] James J. Balsamo, Jr., Environmental Health and Safety Inspection of the St. Thomas Criminal Justice Complex and Criminal Justice Complex Annex on November 5, 1999, at 19–20 (filed Dec. 3, 1999) [hereinafter Balsamo, November 1999 Report].) As a result, the same environmental hazards Mr. Balsamo had documented in his May 1998 report persisted at the jail. (*See* Balsamo, February 1999 Report, *supra*, at 1; Balsamo, November 1999 Report, *supra*, at 1.)

17. During the December 9, 1999, show-cause hearing, Defendants again agreed to hire additional maintenance staff. Over the next eight months, however, Defendants failed to do so, despite repeated prodding by the Court and Plaintiffs' counsel.[11]

18. On August 2, 2000, this Court conducted a tour of the CJC and Annex, followed by a hearing. On the basis of the evidence of continuing repair and maintenance problems, the Court ordered Defendants to hire two additional full-time-equivalent maintenance workers for the CJC and Annex and implement a preventive maintenance program by October 2, 2000. (Order of Sept. 7, 2000, ¶ 5.)

19. Mr. Balsamo inspected the CJC and Annex again in November 2000 (*see* James J. Balsamo, Jr., Environmental Health and Safety Inspection of the St. Thomas Criminal Justice Complex and Criminal Justice Complex Annex on November 10, 2000, at 7 (filed Dec. 15, 2000) [hereinafter Balsamo, November 2000 Report] ), and the parties stipulated to his maintenance findings at the December 20, 2000, contempt hearing (Dec. 20, 2000, Tr. 9:19–25). As of the last inspection, the CJC and Annex still had only one maintenance worker between them. (Balsamo, November 2000 Report, *supra*, at 29, 42.) [12] As a result of this staffing short-

---

**10.** Mr. Balsamo's February 5, 1999, report is appended to Special Master Quarterly Compliance Report No. 7 (Apr. 8, 1999).

**11.** *See* Balaban Decl. of Jan. 12, 2001, Ex. A at 3 (Plaintiffs' counsel's follow-up letter to February 1, 2000, status conference, reflecting that Director Magras had reported that the Government intended to sign maintenance contracts with private vendors); *id.* Ex. C at 2 (follow-up letter summarizing March 28, 2000, conference during which Director Magras stated that the CJC would hire two workers directly and that funds had been allocated for one position, but that the hiring process had not begun); *id.* Ex. D at 2 (follow-up letter summarizing April 18, 2000, conference during which Attorney General Stridiron indicated that there were "no shortcut[s]" to a cumbersome Government hiring process); *id.* Ex. E at 3 (follow-up letter summarizing June 1, 2000, conference during which (a) Attorney General Stridiron reported that the $13,000 salary provided for the maintenance worker position was too low to attract a qualified candidate; (b) Stridiron pledged to seek an increased salary in a supplemental budget request; and (c) the Court instructed the Government to recruit for the position while the budget request was pending); *id.* Ex. G at 3 (follow-up letter summarizing July 14, 2000, conference during which the attorney general reported that the job description for the maintenance position had to be revised to allow for a salary increase); *id.* Ex. H at 3 (follow-up letter summarizing Sept. 20, 2000, conference, during which (a) the attorney general reported that a supplemental budget request for two maintenance positions had not been submitted to the legislature; (b) Director Magras stated that he did not expect the legislature to act on the budget request until at least October; and (c) Magras stated that the BOC had not been recruiting to fill the maintenance worker positions in the meantime).

**12.** According to Mr. Balsamo, jail officials told him on November 10, 2000, that one additional maintenance worker had been hired; however, Mr. Balsamo could not find

age, Defendants had yet to implement a comprehensive preventive maintenance plan at the CJC and Annex. (*Id.* at 29.) The CJC and Annex also continued to be plagued by physical plant and environmental problems, including: (a) faulty control panels, which prevent staff from knowing whether inmates are securely locked in their cells (*id.* at 30); (b) broken pipes in the kitchen (*id.* at 13); (c) faulty temperature gauges in the kitchen's freezer and refrigerator, which can result in food spoilage (*id.* at 14); (d) a broken and potentially dangerous electrical plug on the kitchen's meat slicer (*id.* at 15); (e) poor lighting in the cells (*id.* at 27, 37); (f) inoperable sinks, showers, and water fountains (*id.* at 29, 35, 38); (g) poor air circulation (*id.* at 28, 34); (h) unscreened windows at the Annex, which allow insects and rodents to enter (*id.* at 34); (i) holes in the Annex food storeroom, which have allowed rodents to get into the food supply (*id.* at 39); and (j) unsealed utility and water pipes in the food storeroom, which have allowed water to leak onto the food supply (*id.*); and (k) dangerous electrical wiring in the Annex laundry and shops (*id.*).[13]

20. *Hygiene Articles:* In March 1998, the Special Master found that Defendants neither provided hygiene items to new prisoners nor maintained an adequate floor stock of such supplies. (Special Master

Quarterly Compliance Report No. 6 at 40, 41 (Mar. 25, 1998).)

21. Through 1999, prisoners did not receive items such as shampoo, deodorant, toothpaste, or toothbrushes unless they paid for them, and the jail did not keep an adequate supply of these items for distribution. (Balsamo, February 1999 Report, *supra*, at 16; Special Master Quarterly Compliance Report No. 7 at 36 (Apr. 8, 1999); Balsamo, November 1999 Report, *supra*, at 21.)

22. Following its August 2, 2000, hearing and tour, the Court ordered Defendants to immediately begin providing inmates with hygiene items at admission and to keep an adequate floor stock of such articles so that they could be dispensed as needed. (Order of Sept. 7, 2000, ¶ 7.)

23. As of Mr. Balsamo's November 10, 2000, inspection, the only personal hygiene items prisoners regularly received were soap and toilet paper; all other hygiene items had to be purchased from the jail's commissary or shipped to the prisoner from family or friends. (Balsamo, November 2000 Report, *supra*, at 32 (observing that toothbrushes are provided "sometimes").)[14]

24. By the time of the contempt hearing on December 20, 2000, at least some inmates had received bags containing deodorant, shampoo, a comb, a toothbrush, and toothpaste.[15] These distributions fol-

the worker on site. (*Id.* at 29.) In their Proposed Findings of Fact and Conclusions of Law, Defendants concede that they have not hired any new maintenance staff and state that, while they have identified candidates for two positions, a request for funding of the positions was not submitted to the Virgin Islands Office of Management and Budget until February 2001. (Defs.' Prop. Findings at 2.)

**13.** The environmental problems at the Annex are particularly acute because the jail's sole maintenance worker spends almost all of his time working on necessary repairs at the CJC. (*Id.* at 29.)

**14.** Warden Agnes George testified at the December contempt hearing that prisoners purchased supplies from the commissary because they did not like the brands that were handed out. (Dec. 20, 2000, Tr. 78:4–16.) However, this testimony was inconsistent with her statements that the jail had only in the past few weeks begun to provide hygiene items free of charge. (*Id.* 75:16 to 78:23, 81:8–10.)

**15.** Several inmates stated in their declarations that they had received a kit of hygiene supplies, for the first time since their incarceration, within the past week. (*See, e.g.,* Charles Decl. ¶ 6; Weekes Decl. ¶ 6; Jones

lowed Warden Agnes George's memorandum to staff, about two weeks prior to the hearing, directing that personal hygiene packages be provided to inmates each Wednesday upon request. (Dec. 20, 2000, Tr. 75:16 to 78:23 (testimony of Warden George).) However, Warden George could not say whether all or even most prisoners had been informed of the new policy. (*See id.* 78:11–16 (stating that she did not verify whether officers had followed her instruction to post the new policy).)

25. *Mattresses:* The Special Master reported in March 1998 and April 1999 that Defendants had replaced damaged and soiled mattresses and established a mattress exchange program for new admissions. (Special Master Compliance Report No. 6 at 27 (Mar. 25, 1998); Special Master Compliance Report No. 7 at 21 (Apr. 8, 1999)). However, the Court continued to receive reports from Plaintiffs' counsel that cracked and torn mattresses were still in use. (Pls.' Objections to Special Master Compliance Report No. 6 at 7 (Apr. 13, 1998) (documenting observations from counsel's October 1997 and March 1998 tours); Pls.' Objections to Special Master Compliance Report No. 7 at 4 (Apr. 14, 1999) (noting observations from November 1998 and April 1999 tours).)

26. Following the Court's own tour of the CJC and Annex on August 2, 2000, during which the poor condition of the mattresses was evident, the Court again ordered Defendants to replace damaged mattresses and institute the mattress exchange program. (Order of Sept. 7, 2000, ¶ 8.)

27. As of the contempt hearing on Dec. 20, 2000, damaged mattresses were still common at the CJC and Annex. (*See, e.g.,* Balaban Decl. of Jan. 12, 2001, ¶ 3 (estimating that half of the mattresses inspected by Plaintiff's counsel between December 15 and 20, 2000, were torn); Balsamo, November 2000 Report, *supra,* at 32 (reflecting that Mr. Balsamo observed several torn mattresses during his November 2000 inspection).) Defendants aver that a mattress exchange program is in place and that the remaining soiled or damaged mattress were replaced when a shipment of mattresses was received in January 2001. (Defs.' Prop. Findings at 5.) However, the longstanding nature of the problem, along with the fact that so many mattresses were in poor condition as late as December 2000, suggest that exchanges are not sufficiently regularized.

*Fire Safety*

28. The Agreement requires the Defendants to take the following steps, among others, regarding fire safety at the CJC and Annex: (a) provide working heat and smoke detectors throughout the CJC building [16] and Annex; (b) install a manual fire alarm system; (c) provide fire-rated enclosures of the kitchen, stairways, and utility shafts; (d) implement an emergency evacuation plan and conduct quarterly fire drills for each shift; (e) train staff in fire evacuation and emergency procedures; and (f) provide a sufficient number of staff with keys to unlock doors in the event of an emergency. (Agreement ¶¶ III.1 to III.21.) The Agreement sets a January 1, 1996, deadline for implementing most of these measures.[17]

---

Decl. ¶ 4. *But see* Muiruri Decl. ¶ 3 (stating that he had never been provided with hygiene supplies other than those sent by his family).)

**16.** The CJC has three floors, but the jail occupies only the third floor of the building. In *Carty I,* the Court noted that the CJC's fire alarm system operates only on the third floor

and roof area of the CJC building. *Carty I,* 957 F.Supp. at 737 n. 14.

**17.** Two provisions came with earlier deadlines: staff were to be trained in emergency procedures by November 1, 1994 (Agreement ¶ III.6); heat detectors were to be installed on

29. In 1997, the Court held Defendants in contempt of the fire safety provisions of the Agreement, finding that "cell locking devices, manual alarm systems, smoke dampers, and heat detectors are inoperable, all of which together poses a security risk during a fire emergency," and that "the building itself cannot adequately protect the occupants during a fire." *Carty I*, 957 F.Supp. at 737.

30. Upon touring the CJC and Annex in May 1998, Mr. Balsamo concluded that "[d]ue to a lack of fire safety training, fire drills, fire equipment replacement parts and supplies, fire detection, alarm, and suppression equipment service and maintenance contracts, and written policies and procedures of which all staff are knowledgeable, this facility is a serious threat to the life safety and health of the inmates and staff." (Balsamo, May 1998 Report, *supra*, at 1.)[18] When Mr. Balsamo toured the CJC and Annex again in February 1999, he found essentially the same problems. (*See* Balsamo, February 1999 Report, *supra*, at 1–6, 17–18, 20.)

31. In April 1999, the Special Master found that Defendants had failed to comply with the bulk of the fire safety provisions of the Agreement, and made eleven specific recommendations for improving fire safety at the jail, the first of which was that Defendants correct the deficiencies Mr. Balsamo had identified in his reports. (*See* Special Master Quarterly Compliance Report No. 7 at 44–45 (Apr. 8, 1999).)[19]

32. When Mr. Balsamo conducted another inspection of the CJC and Annex in November 1999, he found no changes in fire safety conditions since his two previous inspections. (*See* Balsamo, November 1999 Report, *supra*, at 1.) He concluded his report by stating that he "fear[ed] for the lives of the inmates should a fire break out in either of these facilities." (*Id.* at 28.)

33. During the December 9, 1999, show-cause hearing, Defendants agreed to hire a fire safety contractor to make the necessary repairs at the CJC and Annex. Over the next eight months, the Court and Plaintiffs' counsel repeatedly pressed Defendants to finalize a contract and make repairs, while Defendants continued to give the impression that work would begin promptly.[20]

the first and second floors, as well as in the basement and the enclosed areas on the roof, by January 1, 1995 (Agreement ¶ III.5.b.)

18. Among the numerous fire safety deficiencies Mr. Balsamo identified were the following: (a) manual pull alarms and smoke detectors at the CJC and Annex were inoperable or missing (*id.* at 2, 13); (b) the fire suppression system in the CJC kitchen was not being inspected on a regular basis, and there was no contract providing for such work to be done (*id.* at 3); (c) staff did not inspect and repair fire extinguishers (*id.* at 4); (d) officers were not trained in fire safety and evacuation procedures, or in the use of fire safety equipment such as extinguishers (*id.* at 2–5, 13); (e) CJC staffing levels were insufficient to protect inmates in the event of a fire or other emergency (*id.* at 4); (f) the CJC was not equipped with fire-rated enclosures (*id.*); (g) fire drills were not conducted regularly (*id.* at 3–4, 13); (h) padlocks were being used to lock individual cells in the Annex (*id.* at 13); and (i) the fire alarm control panel was malfunctioning (*id.* at 2).

19. Other, more specific recommendations included: (a) eliminating of the use of padlocks for individual cells and living areas; (b) replacing all defective smoke detectors and establishing a regular maintenance schedule; (c) inspecting fire extinguishers on a monthly basis; and (d) conducting quarterly fire drills for each shift. *Id.* at 45.

20. *See, e.g.*, Balaban Decl. of Jan. 12, 2001, Ex. A at 2 (Plaintiffs' counsel's follow-up letter to February 1, 2000, status conference, reflecting that BOC Director Horace Magras had assured the Court that fire safety repair work would begin by February 5, 2000); *id.*

34. Following the Court's August 2, 2000, hearing and tour, in which it was apparent that the fire safety deficiencies remained, the Court ordered Defendants to make all necessary repairs to the fire safety systems at both facilities by November 1, 2000. (Order of September 7, 2000, ¶ 1.)

35. The Court entered another order on November 27, 2000, requiring Defendants to (a) immediately submit fire evacuation plans for the CJC and Annex; and (b) submit a memorandum of understanding, describing the roles of the police and fire departments and the BOC in the event of an emergency, by December 4, 2000. (Order of Nov. 27, 2000, ¶¶ 1, 2.) The Court received the evacuation plans on December 1, 2000, and the memorandum of understanding on December 27, 2000.

36. In the report on his November 10, 2000, inspection of the CJC and Annex, Mr. Balsamo noted that fire safety conditions remained substantially the same as in his 1999 inspections (Balsamo, November 2000 Report, *supra,* at 2–12) and stated that "[t]he lack of [corrections officers], the obvious deficiencies in the 'emergency key plan,' inadequately trained officers, an inoperative fire detection and alarm system, inadequate numbers of fire drills, and the evacuation plan deficiencies lead me to conclude that the inmates [sic] life and

safety are severely threatened" (*id.* at 7). At the December 20, 2000, contempt hearing, the parties stipulated to Mr. Balsamo's fire safety findings (Dec. 20, 2000, Tr. 9:19–25), which are set forth more specifically in paragraphs 37–40, *infra.*

37. As of Mr. Balsamo's last inspection on November 10, 2000, the fire alarm and detection systems were still in poor and unreliable condition. (Balsamo, November 2000 Report, *supra,* at 2–4, 35–36.) Several indicators on the fire alarm control panels were malfunctioning (*id.* at 2, 35), and the control panel in Unit B of the Annex had been deactivated (*id.*). A number of smoke and heat detectors in both facilities were missing, broken, or ineffective. (*Id.* at 2,3, 35.) ADT, the fire services contractor, had inspected the fire detection systems and proposed repairs. (*Id.* at 2, 35; *see also* Defs.' Prop. Findings Ex. D (letter of Dec. 18, 2000, from ADT to Assistant Attorney General Schrader).)[21] However, no repair work had been done, and Mr. Braslow concluded that Defendants had not earmarked sufficient funds for the added cost of purchasing replacement parts, which are necessary for maintaining fully functioning alarm and detection systems. (*Id.* at 3, 35.) Defendants assert that repairs to the fire detection systems in the CJC and Annex have since been complet-

Ex. B at 2 (letter of February 26, 2000, from Defendants' counsel noting that a contractor, ADT, had received a contract proposal); *id.* Ex. C at 2 (follow-up letter summarizing March 28, 2000, status conference, during which Director Magras reported that ADT and the Government could not reach an agreement, and that he would meet with another fire safety vendor); *id.* Ex. D at 2 (follow-up letter summarizing April 18, 2000, status conference, during which Attorney General Iver Stridiron reported that the Government and ADT had reached an oral agreement for repairs, which had been memorialized in a proposed contract, and that the Government had already secured funds for

the repair work); *id.* Ex. E at 1 (follow-up letter summarizing June 1, 2000, status conference, during which Assistant Attorney General Richard Schrader, Jr., reported that the ADT contract had not been finalized due to taxes owed by ADT); *id.* Ex. G at 1 (follow-up letter summarizing July 13, 2000, status conference, during which Attorney General Stridiron reported that the repair contract was in place, but that no work would begin until the end of the month).

21. Mr. Balsamo could not determine whether the ADT proposal covered all three floors of the CJC or merely the jail floor. (Balsamo, November 2000 Report, *supra,* at 2.)

ed. While they have provided evidence that ADT planned to make the repairs in January 2001 (Defs.' Prop. Findings Ex. D), they have supplied no documentation of completed work.

38. As of the last inspection, the fire suppression systems at the CJC and Annex were also inadequate. (*Id.* at 4–6, 36.) Security and maintenance staff did not inspect and repair fire extinguishers; one extinguisher was inoperable, and the tamper seals on two others had been broken. (*Id.* at 4–5, 36.) The CJC was not equipped with smoke-resistant barriers and self-closing smoke doors, which are critical to a safe evacuation in the event of a fire. (*Id.* at 8.) The CJC kitchen was not equipped with an effective fire suppression system, and the existing system did not receive regular maintenance. (*Id.* at 5–6.) Additionally, problems still existed with the electronic locking mechanisms on cell and exit doors. One cell could not be opened with the emergency key, meaning that the door could not be opened in the event of a loss of power. (Id. at 11.) Officers also had difficulty opening other doors with emergency keys, which suggested that some keys may be defective.

39. As of the last inspection, corrections officers were not trained in fire safety and evacuation procedures or in the use of extinguishers and other fire safety and detection equipment. (*Id.* at 5–10, 36.) The facilities remained understaffed, jeopardizing the safety of inmates in emergency situations. (*Id.* at 8–9.) Additionally, officers were not equipped with easily recognizable emergency keys that would enable them to swiftly evacuate prisoners. (*Id.* at 11.)

40. As of the last inspection, fire drills were not conducted regularly or according to policy. (*Id.* at 6, 36.) The Agreement and the facility's own fire evacuation plan both require that drills be conducted in all areas, on all shifts, at least once per quarter. The fire drill records from the past year showed that only a single fire drill was performed on either the evening (4 p.m. to 12 p.m.) or overnight (12 p.m. to 8 a.m.) shifts, and that only one drill each was conducted during the first and third quarters. (*Id.* at 6.) At the CJC, prisoners are taken to the roof of the building during drills, with the apparent expectation that in the event of a fire they would be evacuated by helicopter. (*Id.* at 7.) However, the CJC fire plan contains no reference to helicopters,[22] and no arrangements for this mode of evacuation could be produced. (*Id.* at 7, 9.) At the Annex, prisoners are evacuated to a construction area containing items that could be used as weapons. (*Id.* at 36.)

*Medical Care: Medication Distribution*

41. The medication section of the Agreement's medical care provisions requires Defendants to implement the following measures by December 1, 1994:(a) ensure that newly admitted prisoners in need of medications receive them promptly, even if that means transporting them to the hospital; (b) have inmates' prescriptions filled at the pharmacy and returned to the jail within twenty-four hours; (c) ensure that medications are distributed only to the patients for whom they are prescribed; and (d) discard all expired drugs. (Agreement ¶¶ IV.F.)

---

**22.** Defendants submitted the fire evacuation plan for the CJC and Annex on December 4, 2000, pursuant to the Court's Order of November 27, 2000. The plan calls for prisoners to be taken to the parking lot outside the CJC building in the event of a full facility evacuation, and contemplates moving prisoners to the roof only in the event of a partial, "vertical" evacuation. (Criminal Justice Complex/Annex Evacuation Plan at unnum. 3–4 (filed Dec. 4, 2000).)

42. In its January 1997 contempt decision, the Court found that Defendants had violated the medical care provisions of the Agreement but did not specifically cite problems with medication distribution. *See Carty I*, 957 F.Supp. at 737–38.

43. In March 1998, however, the Special Master noted that "[v]endors are not delivering orders for medication to the CJC due to delinquent payments or no payments being made for outstanding invoices." (Special Master Quarterly Compliance Report No. 6 at 58 n. 67 (Mar. 25, 1998).)

44. Charles Braslow, M.D., a correctional health care expert, inspected the jail on behalf of the Special Master on May 22, 1998. Dr. Braslow found that "[t]he medication procurement system, primarily filling prescriptions at local pharmacies, is inadequate for reliably providing prescribed medications for inmates." (Letter of June 6, 1998, from Dr. Braslow to Special Master Grant at unnum. 1, *appended to* Response to Pls.' & Defs.' Objections to Special Master Quarterly Compliance Report No. 6 (June 10, 1998).) He noted seventy-one instances in the three weeks prior to his visit in which prescribed medications were not administered because they were "out-of-stock" and concluded that the "potential for harm in such situations is obvious." *Id.* Dr. Braslow recommended that Defendants "develop[ ] . . . a contractual relationship with a pharmacy or pharmacies which will insure the timely availability of prescription medications for inmates." *Id.* at unnum. 2.

45. By March 1999, when Dr. Braslow again inspected the CJC, the facility had not arranged a medication contract, and the jail's flawed procurement system had resulted in "persistent lengthy periods when inmates are denied prescribed antipsychotic medications because the medications are 'out of stock' . . . ." (Charles A. Braslow, M.D., Report on Health Care Services at CJC, St. Thomas, March, 1999, at 1, *appended to* Special Master Quarterly Compliance Report No. 7 (Apr. 8, 1999).) Explaining the consequences of these failures, Dr. Braslow warned:

> I cannot overemphasize the seriousness of these lapses. Psychotic patients deteriorate when not given their medications and develop behaviors which may be of serious detriment to themselves and to others. Failure to provide these prescribed medications, particularly given the duration of this case and my specific identification of the issue in May 1998, is unconscionable.

Id. at 1.

46. Reporting on his inspection of the CJC on December 2, 1999, Dr. Braslow noted "some improvement" in the medication procurement system, but found that Defendants had nonetheless failed on several occasions to provide prisoners with necessary medication for infections and chronic conditions such as high blood pressure and diabetes. (Charles Braslow, M.D., Evaluation of Healthcare Services at the Criminal Justice Complex, St. Thomas, USVI, December 2, 1999, at 2 (filed Dec. 7, 1999) [hereinafter Braslow, December 1999 Report].)

47. Over the next eight months, both the Court and Plaintiffs' counsel repeatedly urged Defendants to resolve the problems with distribution of medications and enter into a long-term procurement contract.[23]

---

23. *See* Balaban Decl. of Jan. 12, 2001, Ex. C at 1–2 (follow-up letter summarizing March 28, 2000, status conference during which the Court and parties discussed ongoing failures to pay Darby, the pharmaceutical supplier); *id.* Ex. D at 1 (follow-up letter summarizing April 18, 2000, conference during which Plaintiffs' counsel reported that delayed pay-

48. During a July 13, 2000, status conference, the Court instructed the parties to devise a joint stipulation on a medication procurement contract with Darby Pharmaceutical, the jail's private vendor, that would require Defendants to make periodic, "up-front" payments to Darby. (Balaban Decl. of Jan. 12, 2001, Ex. G at 2 (Plaintiffs' counsel's follow-up letter).) Plaintiffs submitted a proposed stipulation to Defendants on July 27, 2000, but never received a response. (Balaban Decl. of Mar. 10, 2001, Ex. B (Plaintiffs' proposed procurement stipulation); *id.* Ex. C at 2 (letter from Plaintiffs' counsel to Court noting that Defendants had not responded to the proposal).)

49. Because Defendants apparently could not agree by stipulation to enter a long-term procurement arrangement by stipulation, the Court on September 20, 2000, ordered Defendants to (a) conduct a utilization review of medications prescribed to CJC and Annex prisoners in order to determine the amount of quarterly payments to be made to Darby, and (b) to provide the Court with a copy of the procurement agreement with Darby by October 20, 2000. (Order of Sept. 20, 2000, ¶ 1.)

50. Defendants have provided the Court with a copy of the contract they submitted to Darby for review. (*See* Balaban Decl. of Jan. 12, 2001, Ex. I.) They have yet to submit a final agreement, however, as required by the Court's order. Although Defendants held discussions with Darby about finalizing a contract (*see* Defs.' Prop. Findings Exs. J, K (letters to Darby from Assistant Attorney General Paul Paquin)), the process has apparently been indefinitely delayed by Darby's institution of a moratorium on contracts (*see id.* Ex. L (letter to Darby from Mr. Paquin seeking written confirmation of moratorium)).

51. While Defendants have made strides in improving distribution of medications at the jail (Dec. 20, 2000, Tr. 108:21–24 (testimony of Dr. Braslow)), the lack of a procurement contract continues to present an unacceptable risk of interruptions in medication, particularly with respect to prisoners requiring anti-psychotic drugs (*id.* 108:15 to 109:24).

*Mental Health*

52. The Agreement requires Defendants to have a system in place by January 1, 1995, for referring prisoners in need of emergency mental health intervention to either St. Thomas Hospital or to Community Mental Health ("CMH"). (Agreement ¶¶ V.1, V.2.) The Agreement further mandates that beds for inmates requiring hospitalization be made available at St. Thomas Hospital by November 1, 1994. (*Id.* ¶ V.6.). Additionally, the Agreement requires Defendants to establish mental health cells for prisoners in need of restraints, seclusion, or observation by December 1, 1994. (*Id.* ¶ V.5.)

53. In 1997, the Court held Defendants in contempt of the mental health provisions the Agreement, finding that acutely mentally ill prisoners were not housed away from others at the CJC, and that prisoners were not transferred to St. Thomas Hospital in emergency situations, since the hospital's mental health unit did not maintain beds for the sole use of prisoners. *Carty I,* 957 F.Supp. at 739 & n. 20, 744–45. The Special Master noted in

ments to Darby had resulted in unavailability of medication for mentally ill prisoners); *id.* Ex. E at 2 (follow-up letter summarizing June 1, 2000, conference during which the Court, observing that Darby refused to fill orders until outstanding balances were paid, suggested that the BOC estimate its monthly pharmaceutical expenses and deposit that amount in an escrow account for Darby).

August 1997 that the shortage of beds for mentally ill CJC inmates was due in part to the fact that as many as half of the hospital's mental health beds were occupied by patients who had been committed to hospitalization by a court. (Special Master Quarterly Compliance Report No. 5 at 83 (Aug. 28, 1997).)

54. In March 1998, the Special Master again found that hospital beds were not being provided for CJC prisoners, but noted that the jail's psychiatrist and other Government officials were meeting to devise alternative placement options, outside the jail, for severely disturbed CJC prisoners. (Special Master Quarterly Compliance Report No. 6 at 74, 75 (Mar. 25, 1998).) The record does not reflect that these meetings produced any progress toward a solution for housing mentally ill CJC prisoners.

55. Through 1999, the Special Master and Dr. Braslow found that beds at St. Thomas Hospital were still unavailable to severely mentally ill prisoners. (Special Master Quarterly Compliance Report No. 7 at 77 (Apr. 8, 1999); Braslow, December 1999 Report, *supra*, at 5.) Dr. Braslow recommended that the Government develop a long-term plan for increasing the number of available inpatient beds for acutely mentally ill prisoners, possibly by building a long-term observation unit for patients committed to hospitalization by a court. (*Id.*)

56. As of the December 20, 2000, contempt hearing, Defendants continued to house acutely disturbed prisoners in need of hospitalization at the CJC. (Dec. 20, 2000, Tr. 124:6 to 126:8 (testimony of Dr. Braslow).) Defendants also continued to house those with chronic mental health problems—including at least one patient who had been adjudged not guilty by reason of insanity—at the CJC, rather than at a secure facility where they might receive appropriate treatment. (*Id.* 124:13–18, 125:8 to 126:4.) The problem of chronic care has proven particularly intractable because there is no facility for providing such care in the Virgin Islands. (*Id.* 124:13–18.)

57. Attorney General Stridiron stated at the contempt hearing that the hospitals of the Virgin Islands, including St. Thomas Hospital, are private entities which cannot be forced to accept prisoners from BOC facilities. The Court notes, however, that the hospitals receive Government funding and fall under the jurisdiction of the Virgin Islands Government Hospitals and Health Facilities Corporation ("Health Facilities Corporation"), which is a "public entity of the Government of the Virgin Islands." 19 V.I.C. § 245(a), (b), (c) (2000). The Health Facilities Corporation has the power to "manage, operate, superintend, control, and maintain the hospitals and health facilities of the Government." 19 V.I.C. § 244(e) (2000). The directors of the corporation are appointed by the governor. 19 V.I.C. § 243(b) (2000).

*Corrections and Security: Recreation*

58. Among the corrections and security provisions of the Agreement is a requirement that Defendants begin to provide prisoners with a minimum of three hours of outdoor recreation each day, seven days per week, by April 1, 1995. (Agreement at ¶ VI.B.1.)

59. In 1997, the Court held Defendants in contempt of the recreation requirement, finding that male prisoners were given only 60 to 90 minutes of recreation, five days per week, while female prisoners "receive access to outdoor recreation infrequently and only at the whim of individual officers." *Carty I*, 957 F.Supp. at 738.

60. In the three years following the contempt finding, CJC and Annex prison-

ers continued to be denied the prescribed amounts of outdoor recreation.[24]

61. On September 7, 2000, the Court modified the three-hour recreation requirement in the Agreement, on the basis of Defendants' representation that there were an insufficient number of officers at the CJC and Annex to provide three hours of daily recreation. (Order of Sept. 7, 2000, ¶ 9.) The Court ordered Defendants to provide prisoners with two hours of recreation, five days a week, while allowing Plaintiffs to revisit the issue once the CJC and Annex were fully staffed. (*Id.*)

62. Recreation logs submitted to the Court show that prisoners at the CJC received two hours of recreation on most days in the months of September, October, and November 2000. (*See* Dec. 20, 2000, Pls.' Ex. 5.) For the Annex, the only log among the submitted materials that covers a period after the Court's modification of the recreation requirement is from November 2000. That log shows that prisoners on most days received one hour of recreation, although on some days they received substantially more. (*Id.*) A number of Annex prisoners testified in their declarations that they received recreation of about an hour a day for only two or three days a week (Mario Emanuel Decl. ¶ 2; Jones Decl. ¶ 5; Maddox Decl. ¶ 5; Weekes Decl. ¶ 6), but these recollections also include practices in place before the

Court's Order of September 7, 2000. Some Annex prisoners, fearing for their own safety, refuse to participate in the recreation because it is provided in an abandoned construction area containing many items that could be used as weapons. (Balsamo, November 2000 Report, *supra*, at 36 (Mr. Balsamo reporting on dangerous condition of the recreation and fire evacuation area); Mario Emanuel Decl. ¶ 2 (stating that he refuses to take recreation because the area is hazardous); Maddox Decl. ¶ 5 (same).)

*Legal Access*

63. The Agreement requires Defendants to implement policies and procedures ensuring the right of prisoners to have access to the courts by January 1, 1995. (Agreement ¶ IX.A.) Among the specific legal access provisions of the Agreement are requirements that by April 1, 1995, Defendants provide prisoners with access to legal supplies as well as a law library with relevant and up-to-date court rules, practice treatises and constitutional, statutory, and case law materials. (Agreement ¶ IX.D.) [25]

64. In 1997, the Court held Defendants in contempt of the Agreement's legal access provisions. *Carty I,* 957 F.Supp. at 741–42, 744–45. The Court specifically found: "The law library at the CJC lacks recent volumes of legal reference materials

---

24. *See, e.g.,* Special Master Quarterly Compliance Report No. 6 at 88 (Mar. 25, 1998) (finding that Defendants did not provide three hours of daily recreation time); Special Master Quarterly Compliance Report No. 7 at 90 & n.' 88 (reporting that CJC inmates received daily recreation time, but that Annex prisoners did not have recreation time during rehabilitation of the facility); Balsamo, February 1999 Report, *supra,* at 5 (reporting that a staff shortage had manifested itself in "inmates ... uniformly complaining that they do not get recreation time because the [corrections officers] tell them they don't have enough staff to stay with them."); Balaban Decl. of Jan. 12,

2001, Ex. B at 2 (letter to Plaintiffs' counsel from Assistant Attorney General Schrader in which Defendants cite manpower and security concerns as the reason for curtailing recreation time).

25. The Agreement also requires Defendants to ensure prisoners' rights to have confidential communications with their attorneys, through mail, telephone, and visits, by January 1, 1996. (Agreement ¶¶ IX.B, IX.C.) Provision of telephone access at the jail is discussed in the next section.

and is not comprehensive. At times, Defendants allow library access on an ad hoc basis and only to sentenced inmates." *Id.* at 741.[26]

65. In the three years following the Court's contempt finding, both the Special Master and Plaintiffs' counsel continued without success to press Defendants to improve the jail's law library.[27]

66. Following its August 2, 2000, hearing and tour, which included an inspection of the library, the Court ordered Defendants to improve the holdings and install a computer and printer in the library. (Order of Sept. 7, 2000, ¶ 10.) The Court also ordered Defendants to provide prisoners with paper, typewriters, and other supplies related to legal matters. (*Id.*)

67. At the December 20, 2000, contempt hearing, Defendants stipulated that CJC and Annex inmates still did not have access to an adequate law library for researching issues related to their convictions, the calculation of their sentences, and the conditions of their confinement. (Dec. 20, 2000, Tr. 7:13–8:20.) The law library did not yet contain up-to-date and complete sets of research volumes such as the Virgin Islands Code and Federal Reporter. (*Id.*) Nor was there an operable computer available to prisoners for legal research. (*Id.*) Subsequent to the hearing, Defendants have submitted an invoice showing that the BOC's librarian in February 2001 ordered a number of volumes for the CJC library. (Defs.' Prop. Findings Ex. I.)[28]

68. Evidence introduced at the contempt hearing suggests that inmates may also not be receiving regular access to the existing, inadequate law library. The log book shows only six visits to the library since August 2000 (*see* Dec. 20, 2000, Pls.' Ex. 7), and several prisoners stated in their declarations that they have been denied access to the library (*see* Charles Decl. ¶ 3; Colburne Decl. ¶ 3; Jones Decl. ¶ 2; Weekes Decl. ¶ 2).

69. Finally, as of the contempt hearing, prisoners still had to purchase their legal supplies from the commissary. (*See* Balaban Decl. of Jan. 12, 2001, ¶ 2 (documenting purchases of legal supplies such as pen, paper, notepad, and envelopes from the commissary during November and December 2000); Carmona Decl. ¶ 3 (prisoner stating that legal supplies must be purchased from the commissary); Phillips Decl. ¶ 3 (prisoner stating that he purchased supplies from the commissary to write a letter to his attorney after his request for a stamp was denied).)

*Telephones*

70. The Agreement requires Defendants to institute policies allowing prisoners reasonable and equitable access to telephones by January 1, 1995. (Agreement ¶ X.E.) Relatedly, among the legal access provisions of the Agreement is a requirement that Defendants ensure pris-

---

26. The Court also noted that library sign-in logbooks showed very few inmates—twenty over a four month period—had actually used the library. *Id.* at 742 n. 30.

27. Following the contempt decision, Plaintiffs' counsel provided Defendants with a list of recommended law library holdings compiled by the American Association of Law Libraries. (Balaban Decl. of Mar. 10, 2001, Ex. A (letter of Nov. 14, 1997).) The Special Master noted in 1998 and 1999 that the library's holdings had yet to be updated or improved. (Special Master Quarterly Compliance Report No. 6 at 88–89, 94–96 (Mar. 25, 1998) at 88–89, 94; Special Master Quarterly Compliance Report No. 7 at 90–91, 96 (Apr. 8, 1999).)

28. The volumes on order are Federal Habeas Corpus, the Virgin Islands Code, Virgin Islands Reports, the Virgin Islands Digest, and the Virgin Islands Court Rules. (*Id.*)

oners' ability to make confidential telephone calls to their attorneys by January 1, 1996. (*Id.* ¶¶ IX.B, IX.C.)

71. Through 1997 and 1998, telephones in the prisoner housing clusters of the CJC were in operable. (*See, e.g.,* Special Master Quarterly Compliance Report No. 4 at 130 (Mar. 28, 1997); Balsamo, May 1998 Report, *supra,* at 11.) In his May 1998 inspection, Mr. Balsamo observed that prisoners were able to make phone calls only when officers assigned to their housing clusters "loaned" them the cluster control cage phone to them. (Balsamo, May 1998 Report, *supra,* at 11.) [29] By November 1999, Defendants had activated the phones in the housing clusters; however, only one cluster's phone could be used at any one time. (Balsamo, Nov. 1999 Report, *supra,* at 20.)

72. When the Court toured the CJC and Annex on August 2, 2000, it found that the telephones in the housing clusters had been removed, and that prisoners were now provided with access to a telephone on two designated days per week. Following the hearing held after the tour, the Court ordered Defendants to install telephones in each housing cluster of the CJC and Annex by November 1, 2000. (Order of Sept. 7, 2000, ¶ 4.)

73. At the December 20, 2000, contempt hearing, Defendants stipulated that they had not yet installed phones in the housing clusters per the Court's order. (Dec. 20, 2000, Tr. 8:22 to 9:7.) Director Magras testified that a Puerto Rico vendor had visited the jail in October 2000 to determine whether the company could install telephones in the housing clusters. (Dec. 20, 2000, Tr. 69:22 to 71:13.) Defendants aver in their Proposed Findings of Fact and Conclusions of Law that review of the vendor's subsequent contract proposal has been delayed by language difficulties. (Defs.' Prop. Findings at 3.) [30]

74. As of the contempt hearing, then, prisoners of each cluster were still provided telephone access on two designated days per week, and each prisoner was restricted to two telephone calls per week. (*Id.*) [31] Although the phones were supposed to be available and activated for prisoners' use between 9 a.m. and 9 p.m., in practice the phones often were not activated until the afternoon, resulting in added difficulty for prisoners trying to reach their attorneys. (*See* Carmona Decl. ¶ 2; Francois Decl. ¶ 2; Weekes Decl. ¶ 3.) Inmates stated in their declarations that if they called their attorney, and the line was busy or the attorney was either unavailable, they could not place another call until the next designated phone day. (*See* Carmona

29. This practice created a security risk because officers at these times were unable to communicate with other jail staff. (*Id.*)

30. Specifically, Defendants report that the vendor submitted its articles of incorporation, business license and certificate of good standing in Spanish; the Virgin Islands government insists that the documents be submitted in English. Thus, the contract remains tied up while the vendor seeks compliant documentation through the Puerto Rico bureaucracy. (*Id.* at 3–4.)

31. Shortly before the December 20, 2000, hearing, Warden George issued a memoran-

dum instructing staff and prisoners that prisoners would be permitted to make legal calls upon request. (Dec. 20, 2000, Pls.' Ex. 2; Dec. 20, 2000, Tr. 64:25 to 65:5, 66:1–3.) However, there was reason to doubt that the policy had been fully implemented, since several prisoners stated in their declarations that they had not heard of the policy until informed of it by Plaintiffs' counsel. (*See* Buchanan Decl. ¶ 5; Carmona Decl. ¶ 5; Francois Decl. ¶ 2; Turner Decl. ¶ 6; Weekes Decl. ¶ 3.) Warden George herself testified that she had not made any effort to ensure that the new policy was being followed. (Dec. 20, 2000, Tr. 67:8–10.)

Decl. ¶ 2; Francois Decl. ¶ 2; Weekes Decl. ¶ 3.) Two inmates also reported that they were not allowed to make phone calls on their cluster's day, despite having signed up to call their attorneys. (*See* Francois Decl. ¶ 2; Turner Decl. ¶ 5.) Additionally, until recently, prisoners who had been appointed defense counsel who live off-island could not call their attorneys free of charge. (*See* Buchanan Decl. ¶ 5; Colburne Decl. ¶ 2.) [32]

*Security Systems*

75. Although the jail's security systems are not covered by specific provisions of the Agreement, their condition falls within the Agreement's broad concern for "the safety and security of prisoners and staff." (Agreement at unnum. 1.) In light of ongoing problems with various security devices at the CJC and Annex, the Court on September 7, 2000, ordered Defendants to make all necessary repairs to the devices by November 1, 2000. (Order of Sept. 7, 2000, ¶ 1.)

76. Defendants have had notice of faulty security systems at the CJC and Annex since May 1998, when Mr. Balsamo found that the clusters' electronic control panels were inoperable, certain electronic locking mechanisms on emergency exit and cell doors were faulty, officers were not equipped with radios or body alarms, and the CJC's intercom system had been deactivated. (Balsamo, May 1998 Report, *supra*, at 4–5, 11, 15.)

77. When Mr. Balsamo toured the facility again in February and November 1999, he noted the same security problems,

and also found that about half of the 30 security camera monitors in the CJC's main control room were not functioning. (Balsamo, February 1999 Report, *supra*, at 5–6, 15–16; Balsamo, November 1999 Report, *supra*, at 7, 20.) The Court entered its Order of September 7, 2000, after touring the facility in August 2000 and finding that security problems persisted.

78. As of Mr. Balsamo's findings in November 2000, to which the parties stipulated at the December 20, 2000, contempt hearing (Dec. 20, 2000, Tr. 9:19–25), few, if any, repairs had been made: problems remained with some locking mechanisms, particularly in the event of power loss (Balsamo, November 2000 Report, *supra*, at 11); the electronic control panels for cell doors were unreliable, meaning that officers could not know for certain whether inmates were secured in their cells (*id.* at 30); the intercom system was turned off because of excessive noise (*id.* at 31, 43); and three-quarters of the security camera monitors in the CJC's main control room were out of order (*id.* at 31).

*Annex Construction*

79. In September 1997, Defendants entered into a Cooperative Agreement Program ("CAP") agreement with the U.S. Marshal's Service to house federal detainees in BOC facilities in exchange for a per diem payment for each detainee as well as $1,329,000 to renovate the CJC Annex so that detainees could be housed there. (Dec. 20, 2000, Tr. 149:14–19 (testimony of Marshal's Service grant specialist Jim Wilmer)). [33] In 1999, the Marshal's Service

---

32. Upon the request of Plaintiffs' counsel in December 2000, Warden George changed the jail's policy to allow free off-island attorney calls. (*See* Balaban Decl. of Jan. 12, 2001, Ex. M (letter of Dec. 5, 2000, from Plaintiffs' counsel).)

33. Pursuant to an order of Chief Judge Moore, federal detainees may not be housed

in BOC facilities, including the CJC and Annex, because of the deplorable conditions there. *In the Matter of Federal Detainers Housed or Lodged in Facilities of the V.I. Bureau of Corr.*, No. 97–15 (D.Vi. April 2, 1997). In March 1998, this Court advised the attorney general and the Marshal's Service that Judge Moore's order could not be lifted until

disbursed approximately $1 million to the Government of the Virgin Islands for Annex renovations. (*Id.* 150:6–15.)

80. In 1997, Defendants executed a contract with F & G Construction Co. ("F & G") for renovation of the Annex. F & G's Frank Buholz began working at the Annex under the contract in April 1998. (Dec. 20, 2000, Tr. 12:19 to 13:11 (testimony of Frank Buholz).)

81. Mr. Buholz experienced repeated delays in receiving payment for his work, and as a result, he was sometimes unable to purchase supplies; renovations thus slowed while he awaited payment from the Government. (Balsamo, February 1999 Report, *supra*, at 11; Dec. 20, 2000, Tr. 30:3–4.) Delays in the renovations allowed dangerous conditions at the Annex to persist, and the unfinished construction created its own hazards. (*See, e.g.*, Special Master Quarterly Compliance Report No. 6 at 24 (Mar. 25, 1998) (noting that "deplorable conditions" continued at the Annex despite the fact that the CAP funds were available to remedy the situation); June 1998 Special Master Report at 3 (expressing "foremost concern [with] the health and safety of inmates in the facility during [the] renovation"); Balsamo, November 2000 Report, *supra*, at 36 (noting dangerous condition of recreation and emergency evacuation area due to unfinished construction).)

82. Despite Defendants' assurances in February 2000 that the Annex renovation would be completed within 90 days (Balaban Decl. of Jan. 12, 2001, Ex. B at 2 (letter of Feb. 26, 2000, from Assistant Attorney General Schrader)), no work occurred over the next few months as the Government and F & G discussed payment

(*id.* Ex. D at 3 (follow-up letter summarizing Apr. 18, 2000, conference during which Attorney General Stridiron agreed to meet with F & G to determine what payments were necessary); *id.* Ex. G at 4 (follow-up letter summarizing July 13, 2000, conference during which the attorney general agreed to pay the $86,000 requested by F & G, and noted that the work could be completed after the public works commissioner signed off on a revision to the contract with F & G)).

83. During the Court's August 2, 2000, tour of the CJC and Annex, Mr. Buholz stated that the project could be completed within 90 days of his receipt of the $86,000 payment. (Dec. 20, 2000, Tr. 13:25 to 14:9, 21:9–15 (testimony of Frank Buholz).) Mr. Buholz understood from Attorney General Stridiron that the money would arrive within two weeks. (*Id.* 15:1–12.) On the basis of this information, the Court ordered Defendants to complete construction of the Annex by November 1, 2000. (Order of Sept. 7, 2000, ¶ 3.)

84. Shortly after the August 2, 2000, hearing, Mr. Buholz and his partner, Geraldo Rivera. had several meetings with Director Magras and Assistant Attorney General Paul Pacquin, who had been assigned to negotiate and draft a contract for the completion of the Annex renovation. (*See* Tr. 18:5–14, 23:13–16 (testimony of Mr. Buholz); *id.* 37:2–5 (testimony of Assistant Attorney General Pacquin).) Defendants insisted that executing a new contract, rather than revising the original contract, was necessary because the six-month term of the 1997 contract had long since expired. (*Id.* 41:22 to 42:5.) Toward the end of August, the Government presented a contract proposal to Mr. Buholz,

---

the BOC demonstrated an ability to manage the inmate population at the CJC "within constitutional limitations." (Special Master Quarterly Compliance Report No. 6 at 5 n. 9

(Mar. 25, 1998).) Thus, Defendants must not only complete the Annex renovation but also comply with the Settlement Agreement before federal prisoners may be housed at the Annex.

along with documents needed to approve the contract—including F & G's articles of incorporation, business license, and certificate of good standing. (*Id.* 37:6–18.) [34]

85. On September 8, 2000, after Mr. Buholz had apparently missed two scheduled meetings with Mr. Pacquin, Mr. Buholz informed Mr. Pacquin that the scope of work to be performed under the new contract needed to be revised to reflect the work left to be done at the Annex under the terms of the original contract. (*Id.* 41:1–21.) Mr. Buholz also raised questions concerning the existence of change orders under the original contract and the computation of the amount of money the Government had retained for disbursement to F & G upon completion of the Annex project. He told Mr. Pacquin that he would find supporting documentation and get back to him later that day on both issues, but Mr. Pacquin did not hear from him. (*Id.* 41:12 to 42:14.)

86. Mr. Buholz missed another meeting with Mr. Pacquin on September 11, 2000, and over the next few days Mr. Pacquin tried twice to reach the contractor. Mr. Pacquin and F & G had no further contact until November 2000. (*Id.* 42:5 to 43:10.) Meanwhile, Mr. Buholz apparently ceased work at the Annex on September 11, 2000. (*Id.* 13:12–20.)

87. On November 2, 2000, Mr. Pacquin received a call from Director Magras, who had Mr. Rivera with him, and the parties reached an agreement on all issues, except the scope of work to be performed under the new contract still had to be resolved. (*Id.* 43:7 to 44:3.) The group agreed that

they, along with an official from the Department of Public Works, would conduct a walk-through at the Annex to determine what work needed to be completed. (*Id.* 44:7–17.) However, on the day scheduled for the walk-through, the public works official canceled. (*Id.*) As of the contempt hearing on December 20, 2000, then, a contract had not been finalized, and no work was being done at the Annex. (*Id.* 19:23 to 20:1.)

88. Defendants aver in their Proposed Findings of Fact and Conclusions of Law that the Governor signed a new Annex construction contract on April 17, 2001. (Defs.' Prop. Findings at 5.) However, they have provided no documentation of such an agreement with F & G; nor has the Court received word that renovation work at the Annex has resumed.

89. Through their continued failure to renovate the Annex, Defendants run the risk of being held in breach of the Marshal's Service CAP agreement, which would lead to a substantial loss of revenue and threaten Defendants' ability to comply with the Agreement and the Court's orders.

90. The Marshal's Service has indicated that it would defer holding Defendants in breach of the agreement if the funds it disburses to the Government were deposited in a segregated fund earmarked solely for BOC operations, and controlled by the director of corrections, the attorney general, and the commissioner of finance. (Dec. 20, 2000, Tr. 160:16 to 161:9, 165:9 to 167:7 (testimony of District of the Virgin Islands Marshal Conrad Hoover).)

---

**34.** Mr. Buholz's failure to provide these documents has apparently been one source of the delay in finalizing a new contract for Annex renovations. Mr. Pacquin concedes, however, that these very documents presumably had already been filed with the Government in connection with F & G's construction con-

tract at the Golden Grove facility on St. Croix. (*Id.* 46:11 to 47:14.) Although Mr. Pacquin knew that F & G was doing work at Golden Grove, he made no effort to determine whether the documents were already in the Government's possession. (*Id.*)

## II. CONCLUSIONS OF LAW

### A. Legal Standard

■ 1. A court has "inherent power to enforce compliance with [its] lawful orders through civil contempt." *Spallone v. United States,* 493 U.S. 265, 276, 110 S.Ct. 625, 632, 107 L.Ed.2d 644 (1990) (quoting *Shillitani v. United States,* 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966)).

■ 2. To hold a defendant in contempt, the court must find that (1) a valid court order existed; (2) the defendant had knowledge of the order; and (3) the defendant disobeyed the order. *Harris v. City of Philadelphia,* 47 F.3d 1311, 1326 (3d Cir.1995) (*Harris I* ); *Roe v. Operation Rescue,* 919 F.2d 857, 871 (3d Cir.1990). Willfulness is not a necessary element. *Harley–Davidson, Inc. v. Morris,* 19 F.3d 142, 148–49 (3d Cir.1994).

■ 3. Contempt must be proved by "clear and convincing evidence," and where there is ground to doubt the wrongfulness of the conduct, the defendant should not be held in contempt. *Robin Woods Inc. v. Woods,* 28 F.3d 396, 399 (3d Cir.1994).

■ 4. A defendant may escape contempt by establishing "that it could not possibly comply with the court's order despite making all reasonable efforts to do so." *Harris v. City of Philadelphia,* 47 F.3d 1333, 1341 (3d Cir.1995) (*Harris II* ). Mere good faith efforts are insufficient. *Robin Woods,* 28 F.3d at 399; *Harley–Davidson,* 19 F.3d at 148–49; *Carty I,* 957 F.Supp. at 743.[35]

5. Defendants do not challenge the validity of the Agreement, which the Court entered as an order on December 7, 1994, or the validity of the Court's remedial orders of September 7, 2000 (fire safety, Annex construction, legal access, mainte-nance, environmental health, hygiene, and recreation), September 20, 2000 (medication distribution), and November 27, 2000 (fire evacuation plans). Nor do Defendants claim ignorance of any of their Court-ordered responsibilities, the neglect of which subjected them to a finding of contempt in 1997 and a second, ongoing contempt hearing since December 1999. Thus, the only element of contempt the Court need consider is Defendants' efforts to comply with the orders.

### B. Defendants' Compliance Efforts

6. The evidence set forth in the Findings of Fact clearly and convincingly establishes Defendants' continued disobedience of the Court's orders, as summarized in paragraphs 7–11, *infra.*

7. Defendants have yet to hire additional maintenance workers, effect numerous repairs, or establish a preventive maintenance program. (Findings of Fact ¶ 19.) Hygiene articles were not distributed free of charge until the eve of the December 2000 contempt hearing (*id.* ¶ 24), and the evidence suggests that Defendants' mattress exchange program is either inadequate or nonexistent (*id.* ¶ 27).

8. Additionally, the safety of staff and inmates remains a grave concern, since Defendants have not upgraded the fire detection and suppression systems (*id.* ¶ 37, 38), do not train staff in emergency procedures (*id.* ¶ 39), and do not conduct regular fire drills (*id.* ¶ 40). Defendants have not made the necessary repairs to malfunctioning security devices, which poses a further safety risk. (*Id.* ¶ 78.) Defendants have also endangered the lives of inmates by failing to secure a long-term pharmaceutical contract that would elimi-

---

**35.** Evidence of good faith is relevant only to a court's consideration of what contempt sanc- tions are appropriate. *Harley–Davidson,* 19 F.3d at 148; *Carty I,* 957 F.Supp. at 743.

nate gaps in providing medication. (*Id.* ¶ 51.)

9. Defendants have yet to provide prisoners at the CJC and Annex with an adequate law library and the necessary legal supplies (*id.* ¶¶ 67–69); moreover, inmates continue to have difficulty communicating with their attorneys because they do not have adequate telephone access (*id.* ¶ 74.)

10. Finally, renovation of the Annex has been indefinitely delayed, threatening to cut off funds from the Marshal's Service that are desperately needed to help remedy the jail's myriad problems. (*Id.* ¶ 89.)

11. With respect to only two of the issues raised by Plaintiffs does the Court find that Defendants substantially complied with the Court's orders. First, inmates appear to be receiving recreation in amounts close to the two hours per day, five days per week mandated by the Court's September 7, 2000, order. (*Id.* ¶ 62.) [36] Second, Defendants have submitted—albeit somewhat belatedly—the emergency plans required by the Court's November 27, 2000, order. (*Id.* ¶ 35.)

### C. Proffered Defenses

12. Over the nearly seven-year history of this case,[37] Plaintiffs have repeatedly sought to justify their inaction by citing budget constraints. *See, e.g., Carty I*, 957 F.Supp. at 744 (setting forth Defendants' argument that noncompliance was excusable—and a contempt finding precluded—by a financial crisis in the Virgin Islands and the BOC's heavy debt burden). Defendants have argued in this contempt proceeding, for example, that they could not hire maintenance workers, or supply the law library with computers and more books, because of delays or failures in securing legislative appropriations. (*See* Defs.' Prop. Findings at 2, 3.)

13. As the Court noted in *Carty I*, however, "[i]n the context of prison litigation in which plaintiffs allege unconstitutional conditions of confinement, 'lack of financing is not a defense to the failure ... to provide minimum constitutional standards in the operation of a ... jail.'" *Carty I*, 957 F.Supp. at 744–45 (quoting *Inmates of Allegheny County Jail v. Wecht*, 699 F.Supp. 1137, 1146 (W.D.Pa. 1988)). While it is the Government's prerogative to lock up criminals and pretrial detainees in prisons, that power carries with it the duty to provide funds for maintaining those prisons in a constitutional manner. *See Battle v. Anderson*, 447 F.Supp. 516, 526 (D.Okla.1977). Moreover, the repeated setbacks in renovation of the Annex, which has funding in place, demonstrate that there is more to Defendants' intransigence than a lack of money.[38]

14. Defendants also contend that the actions of third parties have prevented their compliance with certain orders of the Court. For the reasons discussed in paragraphs 15–17, *infra*, these arguments are unavailing.

15. With respect to the Annex, Defendants pin much of the blame for construction delays on Mr. Buholz of F & G Construction. While the evidence certainly

---

**36.** The safety of Annex prisoners taking their recreation in the construction area remains an issue, however, until Defendants complete the Annex renovation.

**37.** The docket reflects that Plaintiffs filed their Complaint on June 20, 1994.

**38.** Nonetheless, the Court is acutely aware that progress at the CJC and Annex has been hampered by differing priorities and administrative delays outside the direct control of the BOC and Virgin Islands Department of Justice—realities the Court will consider in the event it imposes contempt sanctions.

reflects that Mr. Buholz missed several meetings and failed to provide information that might have jump-started the renovations (Findings of Fact ¶¶ 85, 86), it is equally clear that the Government directly contributed to the current state of affairs. Had Defendants timely paid Mr. Buholz prior to 2000, the Annex would long since have been completed. Mr. Buholz would never have stopped work, and the Government's professed need for a new contract likely never would have materialized.[39] Even after the new contract became a stumbling block, construction might have gotten underway had Assistant Attorney General Pacquin attempted to determine whether the Government already possessed F & G's business documentation (*id.* ¶ 84 n. 34), or even tried to contact Mr. Buholz in the month and a half before the Court's November 1, 2000, deadline for completing Annex construction (*id.* ¶ 86). In fine, Defendants' interactions with F & G do not constitute "all reasonable efforts" to finish the Annex construction.

16. Similarly, Defendants cite Darby Pharmaceutical's moratorium on contracts as the reason they have failed to enter a long-term medication procurement agreement. However, Darby's action cannot immunize Defendants from contempt unless the Government exhausted other possibilities. The Government has presented no evidence that, upon learning of the moratorium, it attempted to contract with another medication supplier. The failure to explore this option—or demonstrate that no other supplier was available—pre-cludes a finding that it was impossible to comply with the Court's order.

■ 17. Lastly, Defendants contend that the shortage of beds at St. Thomas Hospital, as well as hospitals' increasing refusal to accept prisoners with chronic mental health problems, makes it impossible for them to comply with the requirement that they hospitalize mentally ill prisoners. The Court finds this argument unpersuasive for two reasons. First, under the statutory scheme governing health care in the Virgin Islands, Defendants clearly exercise some control over St. Thomas Hospital and other medical facilities. (*Id.* ¶ 57.) The Government has the power, through legislative appropriations and the governor's board appointments, to encourage, if not direct, the expansion of mental health care services in the Virgin Islands. Second, even if the board of the Health Facilities Corporation proved re-calcitrant, the Government would still have the option of contracting with an existing facility or constructing a new one to house mentally ill inmates. The defense of impossibility is limited to "physical impossibility beyond the control of the alleged contemnor" and does not include failure to provide the wherewithal to comply. *Inmates of Allegheny County Jail v. Wecht,* 874 F.2d 147 (3d Cir.1989), *vacated and remanded on other grounds,* 493 U.S. 948, 110 S.Ct. 355, 107 L.Ed.2d 343 (1989), *remanded with instruction to vacate as moot,* 893 F.2d 33 (3d Cir.1990). While the Government has limited resources, it

---

**39.** Mr. Buholz apparently did some work on the Annex into 1999 and 2000, even though the contract, signed in 1997, was for a six-month term. (*Id.* ¶¶ 79, 84.) Because the expiration of the contract did not seem to matter before the Government raised the issue in August 2000, Plaintiffs' counsel has argued that a new contract is not necessary. (Pls.' Prop. Findings at 36.) Defendants counter that, whatever Plaintiffs' views of what is necessary, the old contract has expired and Government procedure must be followed to create a new one. (Defs.' Prop. Findings at 7.) The Court takes no position on this dispute, but notes that Defendants' belated insistence on a new agreement blunts their argument that construction delays are primarily the fault of F & G.

must realize that the choice to not spend sufficient funds on care for mentally ill inmates—or on other aspects of CJC and Annex operations—exposes Defendants to contempt.

### D. Contempt Finding and Sanctions

■ 18. On the basis of the foregoing conclusions of law, the Court finds that Defendants have not made all reasonable efforts to comply with the Court's orders. The Court therefore holds Defendants in contempt of the Agreement and subsequent remedial orders.

19. Having found Defendants in contempt, the Court turns to a consideration of sanctions. "The law affords courts great ... discretion in fashioning an appropriate sanction for contempt." *Carty II,* 986 F.Supp. at 938; *see also Robin Woods,* 28 F.3d at 399. A court exercises its discretion based on its understanding of the case and the contemnor, paying particular regard to the extent of prior compliance or noncompliance. *Carty II,* 986 F.Supp. at 938.

■ 20. A court's remedial powers and discretion in fashioning sanctions are not unlimited, however. *Spallone,* 493 U.S. at 276, 110 S.Ct. at 632. "In selecting contempt sanctions, a court is obliged to use the least possible power adequate to the end proposed." *Id.; see also Gregory v. Depte,* 896 F.2d 31, 37 (3d Cir.1990). Additionally, in devising a remedy against a governmental defendant, the court must take into account the interest of state and local authorities in managing their own affairs. *Spallone,* 493 U.S. at 276, 110 S.Ct. at 632; *Milliken v. Bradley,* 433 U.S. 267, 280–81, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977).

21. Sanctions generally take the form of one of two types of fines. Compensatory fines, payable to the plaintiff for damages caused by the defendant's non-compliance, must not exceed the actual loss suffered by the aggrieved party. *Elkin v. Fauver,* 969 F.2d 48, 52 (3d Cir. 1992). Alternatively, these sanctions may be used to remedy the problems underlying the contempt finding. *Local 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC,* 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986). Coercive sanctions, imposed to induce compliance, are conditional in that the contemnor must be permitted to avoid them by adhering to the court order. *United States v. North,* 621 F.2d 1255 (3d Cir.1980).

■ 22. In addition to fines, the court may require the contemnor to undertake affirmative acts, even acts not required by the initial order. *In re Arthur Treacher's Franchisee Litigation,* 689 F.2d 1150, 1159 (3d Cir.1982).

23. With the foregoing principles in mind, the Court will follow the process set forth in paragraphs 24–26, *infra,* to determine the sanctions, if any, to be imposed against Defendants.

24. The parties may present their positions as to the specific types and amounts of sanctions that are warranted at the next status hearing on June 5, 2001, in St. Thomas.

25. The Court recognizes that, since the December 20, 2000, contempt hearing and the parties' submission of Proposed Findings of Fact and Conclusions of Law, Defendants may have complied with more provisions of the Agreement and remedial orders. The Court therefore directs that Plaintiffs' counsel immediately contact Mr. Balsamo to arrange for him to make a thorough environmental health and safety inspection of the CJC and Annex. Plaintiffs' counsel shall also arrange for Dr. Braslow to conduct an evaluation of health care services at the jail. These inspections shall be made within 30 days of the date of this opinion. Mr. Balsamo and Dr. Bras-

low shall submit to the Court written reports detailing their findings, including the violations that still exist, on or before July 20, 2001.[40]

26. Upon receipt of the experts' reports, the Court will issue an opinion setting forth its determination of sanctions.

### III. *CONCLUSION*

For the reasons stated herein, the Court concludes that Defendants are in contempt of the Agreement and subsequent remedial orders. An appropriate order follows. That order also sets forth the manner in which the Court and parties will proceed with regard to sanctions.

### ORDER REGARDING CONTEMPT MOTION

**THIS MATTER** having come before the Court on its own motion for consideration of whether Defendants should be held in civil contempt of the Settlement Agreement and related Court orders;

The Court having held an evidentiary hearing on the issue of contempt on December 20, 2000;

The Court having reviewed the record and the submissions of the parties;

For the reasons set forth in the Court's Opinion of this date;

**IT IS** this 4th day of June, 2001, **HEREBY**

**ORDERED** that Defendants are in civil contempt of the Agreement and related Court orders; and

**IT IS FURTHER ORDERED** that argument on the issue of contempt sanctions shall be heard during the status hearing scheduled for June 5, 2001, at 11 a.m. at the District Court of the Virgin Islands in St. Thomas; and

**IT IS FURTHER ORDERED** that Plaintiffs' counsel shall immediately contact James J. Balsamo, Jr., and arrange for him to make a thorough environmental health and safety inspection of the CJC and Annex within thirty days of this Order; and

**IT IS FURTHER ORDERED** that Plaintiffs' counsel shall immediately contact Dr. Charles Braslow and arrange for him to conduct an evaluation of health care services at the CJC and Annex within thirty days of this Order; and

**IT IS FURTHER ORDERED** that Mr. Balsamo and Dr. Braslow shall submit to the Court an original and two copies of their written findings, including any violations that still exist, on or before July 20, 2001;[1] and

**IT IS FURTHER ORDERED** that Mr. Balsamo and Dr. Braslow shall also submit to the Court an original and two copies of their respective invoices, directed to the Government of the Virgin Islands, detailing the work they performed and setting forth their expenses in itemized form, on or before July 20, 2001;[2] and

**IT IS FURTHER ORDERED** that the above-referenced submissions to the Court be sent to Judge Stanley S. Brotman, Mitchell H. Cohen U.S. Courthouse Suite 6040, Fourth and Market Streets, Box 1029, Camden, NJ 08102; and

---

**40.** In addition to their reports, Mr. Balsamo and Dr. Braslow shall submit to the Court invoices detailing the work performed and listing their itemized expenses. These invoices will form the basis of an order directing Defendants to make payment.

**1.** Upon receipt of the experts' reports, the Court will furnish counsel with copies.

**2.** The Court will attach these invoices to an order directing Defendants to make payment within ten days of the date of the order. The Court expects that such payment will be timely made.

**IT IS FURTHER ORDERED** that, in addition to those persons provided for on the attached service list, the Clerk shall furnish the following persons with a copy of this Order and the accompanying Opinion:

(a) Governor Charles W. Turnbull;

(b) the President and each Senator of the Legislature of the Virgin Islands;

(c) the Chief Judge and each of the Judges of the Territorial Court of the Virgin Islands;

(d) Chief Judge Raymond Finch;

(e) Judge Thomas Moore;

(f) Magistrate Judge Geoffrey Barnard;

(g) Magistrate Judge Jeffrey Resnick;

(h) Acting U.S. Attorney for the Virgin Islands David Atkinson;

(i) U.S. Marshal for the Virgin Islands Conrad Hoover;

(j) The Daily News;

(k) The Avis.